Terrence J. FAHY,
Plaintiff–Respondent,

v.

DRESSER INDUSTRIES, INC., et al.,
Defendants–Appellants.

No. 69287.

Supreme Court of Missouri,
En Banc.

Nov. 17, 1987.

Rehearing Denied Dec. 15, 1987.

Gerald D. Morris, Ian P. Cooper, David A. Boresi, St. Louis, Mo., for defendants-appellants.

Douglas P. Dowd, St. Louis, Mo., for plaintiff-respondent.

BILLINGS, Chief Justice.

Defendant Dresser Industries, Inc. (Dresser) appeals from a $3,000,000 jury verdict in this products liability action finding it 100% at fault for injuries suffered by plaintiff Terrence J. Fahy when he was run over by an asphalt roller. The jury found in favor of Dresser's co-defendant, Machinery, Inc., an alleged seller of the roller. The Missouri Court of Appeals, Eastern District, concluded that Fahy had failed to prove that his injuries were caused by any defect in the roller and reversed and entered judgment for Dresser. This Court granted transfer, Mo. Const. art. V, sec. 10. Affirmed.

The asphalt roller at issue here was manufactured in 1950 by Galion Iron Works and Manufacturing Co. Galion was later acquired by Dresser and Dresser therefore now stands in the position of original manufacturer. The roller is known as a 3 to 5 ton Tandem Roller. It has two rolls which are hollow and can be filled with water to increase the weight, and therefore the compression capability, of the machine. The total weight of the roller unballasted, i.e., without water in the rolls, was in excess of 7000 pounds.

After the roller had passed through an indeterminate number of owners, County Asphalt and Paving Co. purchased it in 1964 or 1965. Hired to repave the drives of St. Trinity Cemetery in South St. Louis County, County Asphalt had the roller at the cemetery on August 23, 1979. The operator of the roller that day was plaintiff Fahy. Fahy, aged nineteen, had been a regular roller operator for County Asphalt for a year and a half. On this day, Fahy's job was to compress previously spread gravel into hot oil with the Galion roller. At about two in the afternoon, something went awry and Fahy was caught under and run over by the roller. Although several co-workers saw Fahy within a few minutes of the accident, no one witnessed it. Miraculously, Fahy survived, albeit with catastrophic injuries.

Fahy brought this products liability suit against Dresser, alleging that the roller had been designed defectively. There is some controversy as to exactly what design defect Fahy was attempting to prove at trial. Fahy states that he was trying to show that the roller was defective because it was designed so that it was able to operate even when no one was in the driver's position. Dresser urges that Fahy tried to prove that the defect was that the roller should have been designed with a deadman switch. A deadman switch is a control which will shut off the motive force of a machine in the event that the operator leaves the driver's position. The positions taken by Fahy and Dresser are simply alternative verbal formulations of the same defect. If the roller here had had a deadman switch it could not have operated if no one was in the driver's position. Any device that would have prevented the roller from operating when no one was in the driver's position would have been, by definition, a deadman switch.

Dresser's principal point on appeal is that Fahy failed to make a submissible case. In order for a plaintiff to recover under a products liability theory for an injury caused by an allegedly defective product, he must establish each of the following:

(1) defendant sold the product in the course of its business;

(2) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use;

(3) the product was used in a manner reasonably anticipated;

(4) plaintiff was damaged as a direct result of such defective condition as existed when the product was sold. MAI 3d 25.04. *See also Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 375–76 (Mo. banc 1986); *Keener v. Dayton Elec. Mfg. Co.,* 445 S.W.2d 362, 366 (Mo. 1969).

In reviewing a challenge to the submissibility of a case, the evidence is to be considered in the light most favorable to plaintiff, plaintiff is to receive the benefit of all inferences reasonably drawn from the evidence, and defendant's evidence that does not support plaintiff's case is to be disregarded. *E.g., Hansome.v. Northwestern Cooperage Co.,* 679 S.W.2d 273, 274 (Mo. banc 1984).

Dresser argues Fahy failed to make a submissible case because Fahy introduced insufficient evidence to prove that the absence of a deadman switch was the proximate cause of Fahy's injuries and thereby failed to prove the fourth element of a products liability case.

An expert witness for Fahy, Boulter Kelsey, testified that in his opinion the roller was defective because it lacked a deadman switch. He further testified that "the defect was the direct cause" of the accident because, "had the roll stopped when Mr. Fahy left the operating position, it would not have rolled over him." An assumption underlying these opinions by Kelsey was that, immediately before the accident, Fahy had been in the driver's position on the roller and had then fallen from this position into the path of the roller. Dresser asserts that these expert opinions do not constitute sufficient evidence to submit the case because Kelsey's opinions were based on evidence insufficient to prove that Fahy had been in the driver's position immediately before the accident and had then fallen from this position.

▮▮▮▮ It is true that an expert's opinion must have a substantial basis in facts actually established. *E.g., Schears v. Missouri Pac. R.R. Co.,* 355 S.W.2d 314, 321 (Mo. banc 1962). However, the Court concludes the evidence, viewed most favorably to Fahy, was sufficient to prove Fahy was in the driver's position immediately before the accident and he fell off and was run over by the roller. Scott Thoele, a co-worker of Fahy who was apparently the last person to see Fahy before the accident, testified that he saw Fahy off the roller cleaning tar and gravel from the roller wheels about five minutes before the accident. After that, within a minute or two of the accident, Scott saw Fahy back on the roller, operating it. This testimony that Fahy was operating the roller within a minute or two of the accident, coupled with the evidence that Fahy's crushed body was discovered lying behind the still moving roller, gives rise to the reasonable inference that Fahy fell from the driver's position to the ground and was crushed by the roller.

The testimony of Kent Thoele does not nullify this reasonable inference. Kent, also a co-worker of Fahy, testified that he saw Fahy off the roller cleaning its wheels "no more than a minute before the accident, *I guess.*" (Emphasis added.) Kent's testimony that *he guessed* Fahy was cleaning the roller no more than a minute before the accident is not necessarily inconsistent with Scott's testimony he saw Fahy operating the roller *within* a minute or two of the accident because both were only estimating the time. Making allowances for the subjectiveness of these time estimates, the jury could reasonably have believed Fahy finished cleaning the roller wheels about a minute before the accident and then climbed back on the roller only to soon fall off it.

Moreover, further evidence indicated that Fahy had finished cleaning the roller wheels before the accident. Kent testified Fahy was using gasoline and a rag and maybe a thin metal scraper to clean the tar and gravel from the roller wheels. Kent also testified Fahy normally kept the can of gasoline near him while he cleaned the wheels and would put the can to the side of the road when he finished cleaning and was ready to start to work again. The can of gasoline, the rag, and the scraper were all discovered after the accident sitting by a tree off to the side of the road. Lonnie Lucas, another co-worker of Fahy, testified

that he had talked with Fahy "a few minutes," another subjective time estimate, before he became aware of the accident. Fahy told Lucas he was finished cleaning the roller wheels and ready to proceed with the paving job. The testimony as to Fahy's normal cleaning procedure and the testimony from Lucas, when combined with Scott Thoele's testimony, is substantial evidence that Fahy finished cleaning the roller wheels, got back on the roller, began to compress gravel into the hot oil, and then, for whatever reason, fell into the path of the roller.

■ Dresser also contends that Kelsey's expert opinion that Fahy's injuries were directly caused by the absence of a deadman switch is not supported by sufficient evidence that, even had the roller been equipped with such a control, it would have stopped its motion before rolling over Fahy. This contention is without merit because Scott Thoele testified that he ran to the roller after it had run over Fahy to turn it off and that the roller rolled "a couple of feet" after he shut the engine off. There was also testimony from Kelsey that a deadman switch could be designed to apply the brakes at the same time it disengages the drive of a machine. Thus, if this roller had had a deadman switch which also applied the brakes, it seems that the roller would have stopped in much less than "a couple of feet" after Fahy left the driver's position and thus activated the switch. Viewing this evidence most favorably to Fahy, a jury could reasonably infer that the roller would have stopped in the time it would have taken Fahy to fall from the roller.

Because there was substantial evidence that Fahy was in the driver's position immediately before the accident and then fell and that the roller would have come to a stop before rolling over Fahy had it been equipped with a deadman switch, Kelsey's expert opinion that the absence of a deadman switch was the direct cause of Fahy's injuries was based on substantial evidence presented at the trial. Thus, Kelsey's opinion provided sufficient evidence to allow a jury to decide whether Fahy's injuries were proximately caused by a defect in the roller.

Dresser also argues that Fahy failed to provide sufficient evidence that the absence of a deadman switch was the proximate cause of his injuries in that, even if the roller had had such a switch, Fahy's evidence is not sufficient to prove that it would not have been circumvented by modifications made to the roller subsequent to its manufacture. The Court declines to require a plaintiff to provide evidence that a safety device, which was not incorporated into a machine, would not have been circumvented had it been so incorporated.

■ Dresser's last argument with respect to the sufficiency of the evidence on the issue of proximate cause is that the trial court violated its constitutional due process rights by submitting this case to the jury. This is because submission of this case "would allow a jury to decide the issue of liability without any legally fixed standards." In order to preserve a constitutional question for review, however, it must be presented to and passed upon by a lower court. *E.g., Atkins v. Department of Bldg. Regs.*, 596 S.W.2d 426, 433 (Mo. 1980). Dresser first raised this constitutional argument in its brief before this Court and thereby failed to preserve it. Even had the argument been preserved, it would have been meritless. Jury instructions, conforming to the law and approved by this Court, informed the jury of the standards it was required to apply.

Dresser next argues that Fahy failed to make a submissible case because there was no evidence that the roller was in substantially the same condition at the time of the accident as it was when sold by Dresser. Because the fourth element of a products liability case requires the plaintiff to prove that he was damaged as a direct result of a defective condition of a product *which existed when the product was sold, see* MAI 3d 25.04, Fahy did have the burden to prove that the roller was in substantially the same condition at the time of the accident as it was when sold by Dresser. *See Keener v. Dayton Elec. Mfg. Co.*, 445 S.W. 2d 362, 364 (Mo.1969).

The roller was modified in several respects after it was purchased by Fahy's employer, County Paving. The question here, however, is whether any of these changes were substantial. Fahy's theory at trial was that the roller was defective because it did not have a deadman switch. Fahy presented evidence that the roller could have been designed with a directional lever, called a neutral safety, which would automatically return to neutral when released. Given Fahy's theory at trial, any modification of the roller which would not have altered such a deadman switch, had it been installed, would have been insubstantial. In other words, if the roller had had a neutral safety which had not been circumvented, Fahy's accident would have been avoided despite the other modifications to the roller. Given that there is no indication that this roller's directional lever was modified in any way, Fahy's evidence that the roller could have been designed with a neutral safety gives rise to the reasonable inference that the modifications to the roller did not put it in a substantially changed condition.

Dresser's final argument pertaining to the submissibility of Fahy's case is that Fahy presented no evidence that the roller was being used in a manner reasonably anticipated at the time of the accident. There is no merit to this argument. As discussed above, Scott Thoele, apparently the last person to see Fahy before the accident, testified that he saw Fahy using the roller to compress gravel into hot oil within a minute or two of the accident. When the accident was discovered, Fahy's mangled body was found lying in the middle of the driveway being paved. Immediately after the accident tar and bits of gravel were clinging to Fahy. This evidence, viewed most favorably to Fahy, gives rise to the reasonable inference that Fahy was still using the roller to compress gravel into hot oil at the time of the accident. This was the job for which the roller was designed. Use of the roller in a job for which it was designed is a reasonably anticipated use. Consequently, there was sufficient evidence to prove that the roller was being put to a reasonably anticipated use at the time of the accident.

Dresser seeks to avoid this simple conclusion by arguing that, as a matter of law, it could not have reasonably anticipated that the roller would be used in its modified condition. There is nothing unforeseeable, however, about an owner of a machine making modifications to it and then continuing to use it after doing so. *See Love v. Deere and Co.*, 684 S.W.2d 70, 76 (Mo. App.1985).

Dresser's second point relied on is that the trial court erred in refusing to declare a mistrial after striking the accident reconstruction testimony of Fahy's expert witness, Boulter Kelsey. Kelsey was initially permitted to testify that in his opinion the accident occurred after Fahy had finished cleaning the roller wheels and had returned to the driver's position of the roller. While in this position, Kelsey continued, Fahy leaned forward and over the right side of the roller, most likely to reach the engine control panel located on the right side of engine casing. Fahy then lost his balance, Kelsey concluded, probably because the roller jerked, and fell off the right side and into the path of the rear roller wheel. Kelsey stated that Fahy could have been run over by the roller after falling off the side of the roller because, if the steering wheel was turned, the rear of the roller would swing out to enable it to make the turn. Subsequent to the admission of this reconstruction testimony, the trial court determined that it should not have been admitted and instructed the jury, orally and by written instruction, to disregard this evidence. The court refused to grant a mistrial at Dresser's request.

The decision as to whether to grant a mistrial rests in the sound discretion of the trial court and, absent a manifest abuse of that discretion, an appellate court should not interfere. *E.g., Hoene v. Associated Dry Goods Corp.*, 487 S.W.2d 479, 485 (Mo.1972). Additionally "the withdrawal and exclusion of erroneously admitted evidence [ordinarily] leaves no ground for reversing the judgment on account of such admission because it is, in the absence of

exceptional circumstances, to be assumed that the jury obeyed the trial court's direction and considered only legal evidence." *Pender v. Foeste,* 329 S.W.2d 656, 662 (Mo. 1959).

█ There are no exceptional circumstances here which lead to the conclusion that the jury ignored the withdrawal instruction. Kelsey's testimony as to product defect and causation and his reconstruction testimony were discrete enough so that the jury would have had little difficulty in knowing which testimony it could consider and which testimony was withdrawn. Ample admissible evidence was available for the jury to reach the conclusion it did. Besides, Kelsey's reconstruction testimony added nothing to Fahy's case. As discussed above, in order for Fahy to make his case he needed to prove that he had finished cleaning the roller wheels and was back in the driver's position immediately before the accident and then had fallen somehow and been run over by the roller. The evidence from Scott and Kent Thoele and Lonnie Lucas already gave rise to the reasonable inference that this was what happened. The only thing added by the reconstruction testimony was a hypothesis as to what caused Fahy's fall. Proof of the cause of the fall, however, was unnecessary to Fahy's case because, according to Kelsey's unstricken opinion, Fahy's injuries would have resulted from a fall from the roller regardless of the cause. The trial court did not abuse its discretion in denying Dresser's motion for mistrial.

Dresser's third assignment of error is that Fahy's lawyer misstated the law during closing argument when he asserted that Dresser could have had Teledyne Wisconsin Motors and Allied Construction Company included on the verdict form so that the jury could assess a percentage of fault to them. Teledyne Wisconsin had manufactured the replacement engine which County Asphalt had placed in the roller. Allied Construction had sold the replacement engine to County Asphalt. These two companies had originally been defendants in this suit but they reached settlements with Fahy before trial and

were dismissed from the suit with prejudice. Dresser argues that it could not legally have forced the inclusion of these settling entities on the verdict form.

█ Misstatements of law are impermissible during closing argument and a trial court has the duty, not discretion, to restrain and purge such arguments. *E.g., White v. Gallion,* 532 S.W.2d 769, 771 (Mo. App.1975). In Missouri, fault is only to be apportioned among those at trial. *E.g., Jensen v. ARA Services, Inc.,* 736 S.W.2d 374, 377 (Mo. banc 1987). Therefore, Fahy's lawyer's comment that Dresser could have included the two settling entities on the verdict form for apportionment of fault is a misstatement of law. However, a party is not entitled to assign as error improper arguments or remarks made at the trial by adverse counsel, where they were called forth by equally improper arguments or remarks made by his own counsel. *Bobos v. Krey Packing Co.,* 323 Mo. 224, 232, 19 S.W.2d 630, 633 (banc 1929); 5 C.J.S. Appeal and Error sec. 1508 (1958). *See also Hesse v. Wagner,* 475 S.W.2d 55, 59 (Mo.1971); *Eddings v. Keller,* 400 S.W.2d 164, 171–72 (Mo.1966).

█ Here, Fahy's lawyer's improper argument was called forth by improper argument made by Dresser's lawyer. During Dresser's portion of closing argument the trial court ruled that Teledyne Wisconsin and Allied Construction were not to be referred to as having previously been defendants in the case. Immediately thereafter, Dresser's lawyer stated:

> I submit that the evidence was that at one time Teledyne and Allied were party Defendants in this lawsuit. They're not in the lawsuit today. I'm not at liberty to explain why, but again, I have no objection ... if [Fahy's lawyer] wants to explain....

This appears to have been a deliberate attempt by Dresser to improperly inject the settlement that Fahy had reached with Teledyne Wisconsin and Allied Construction into the jury's deliberations, despite clear direction from the trial court that it not do so. It was in retaliation to the improper argument by Dresser's lawyer that Fahy's

lawyer made his improper argument that Dresser could have had Teledyne Wisconsin and Allied Construction included on the verdict form, but did not because Dresser knew it was at fault. Dresser cannot now assign error to this argument because it was invited by its own lawyer's improper argument.

Dresser's fourth point on appeal is that it should have been permitted to read into evidence allegations from petitions by Fahy which had been superseded. In the portions of the pleadings which Dresser desired to read Fahy alleged that Teledyne Wisconsin and Allied Construction directly caused his injuries because they manufactured and sold a replacement engine for the roller which was defective and unreasonably dangerous in that it was not equipped with a deadman switch. Dresser asserts that these allegations were admissions against interest by Fahy because they are admissions that some entity other than Dresser was liable for his injuries.

 A superseded pleading is admissible against the party in whose behalf it was originally filed if it contains admissions or statements of fact against the interest of such party. *E.g., Carter v. Matthey Laundry & Dry Cleaning Co.*, 350 S.W.2d 786, 791 (Mo.1961). General allegations that simply state that plaintiff's damages were caused by some conduct on the part of defendant, however, are legal conclusions, not admissions of fact and, as such, are not admissible as admissions against interest. *Wors v. Glasgow Village Supermarket, Inc.*, 460 S.W.2d 583, 590 (Mo.1970). The allegations Dresser sought to read into evidence were general allegations of the type discussed in *Wors*. Thus, they are not admissible as admissions against interest.

Dresser's fifth point on appeal is that Fahy's lawyer should not have been permitted to read into evidence the deposition testimony of Fahy's expert witness, Dr. Frank Arnold, that it was his opinion that the roller was defective because it was capable of moving when no one was on it. Dresser contends that this opinion is inadmissible because it lacked foundation in that the question eliciting the opinion omitted facts showing similarity in the roller's condition at the time of manufacture and at the time of the accident and showing that Fahy was using the roller in a reasonably anticipated manner at the time of the accident.

 Any objection to deposition testimony is waived if the ground of the objection is one which might have been obviated if presented at the time the testimony is elicited. Rule 57.07(d)(3). Dresser did not object to the question at issue here at the deposition. Had Dresser objected then, the ground for the objection could have been obviated by reformulation of the question to provide the proper foundation for Dr. Arnold's opinion. Dresser's failure to object at the deposition resulted in a waiver of the objection. *See Schiles v. Schaefer*, 710 S.W.2d 254, 262 (Mo.App.1986). In any event, admission of Dr. Arnold's opinion did not prejudice Dresser because it was cumulative of the testimony of Boulter Kelsey who had also stated that the roller was defective in that it could operate without anyone on it. *See Mercantile Trust Co. v. Harper*, 622 S.W.2d 345, 352 (Mo.App. 1981).

Dresser's sixth point on appeal is that the trial court abused its discretion in not granting a new trial on the basis of newly discovered evidence. At the trial, Dennis Collins, an employee of the City of St. Louis, testified that he operated an eight to twelve ton Ferguson asphalt roller for the city which had a directional lever, called a neutral safety, which automatically returned to neutral and stopped the roller when it was released by the operator's hand. Seventy days after the entry of judgment in this case, Dresser submitted a supplemental motion for new trial accompanied by an affidavit and a sworn statement attesting that the city operated an eight to twelve ton Ferguson asphalt roller which did not have a neutral safety. Dresser asserts that this new evidence contradicts Fahy's evidence that the city operates a Ferguson roller with a neutral safety and generally refutes the notion that a neutral safety is a practical feature on a roller.

The grant of a new trial on the basis of newly discovered evidence is not favored and rests largely in the sound discretion of the trial court. *E.g., Desloge v. County of St. Louis,* 431 S.W.2d 126, 135 (Mo.1968). Questions as to the diligence of Dresser in procuring this evidence and the timeliness of the motion for new trial aside, the trial court did not abuse its discretion here in denying a new trial because the "new" evidence here is not material. The party seeking a new trial on the basis of newly discovered evidence must show that the new evidence is so material that it would probably produce a different result if a new trial were granted. *E.g., Young v. St. Louis Public Service Co.,* 326 S.W.2d 107, 111 (Mo.1959).

Here, there is no indication that the Ferguson roller uncovered by Dresser is the same Ferguson roller which is operated by Dennis Collins. It is quite possible that the City of St. Louis operates two eight to twelve ton Ferguson asphalt rollers. Without any indication that the two Ferguson rollers are, in reality, the same machine, the evidence that the Ferguson roller uncovered by Dresser has no neutral safety in no way contradicts the testimony of Dennis Collins or refutes the practicality of a neutral safety. Therefore, this evidence would have little effect on a jury.

Dresser's final assignment of error is that the trial court should have ordered a new trial because the $3,000,000 verdict was so excessive as to be obviously the result of passion and prejudice on the part of the jury. Alternatively, Dresser argues that the judgment against it should have been reduced by the amount of the settlement between Fahy and Teledyne Wisconsin and Allied Construction.

Fahy suffered grave injuries from a seven thousand pound asphalt roller running over the full length of his body. Fahy's skull was fractured into multiple pieces. Brain tissue and spinal fluid came out of his nose. His brain swelled, causing extremely high brain pressure. Fahy's facial bones were essentially separated from his skull. His nose and jaw were broken and some teeth were knocked out. He suffered a severely fractured pelvis and a fracture of the lumbar spine. His urethra was severed and blocked.

Fahy received extensive medical treatment for these and other injuries. A hole was drilled in his skull so that the pressure on his brain could be measured. He was given drugs to reduce this brain pressure. His facial bones were wired back to his skull. Doctors performed a tracheostomy, to help Fahy breath more easily, and exploratory abdominal surgery. Pins were placed in Fahy's pelvis, which was itself placed in a sling, to stabilize it so that it could heal. He was in traction for months. Three times doctors performed surgery to repair Fahy's urethra. A prosthesis was implanted in his penis to alleviate impotency caused by the accident. For months, Fahy underwent extensive physical therapy to learn to walk again.

Fahy has permanent brain damage. He is unemployable. He suffers from irritability, depression, confusion, dizziness, headaches, backaches, pain and stiffening in his hips, insomnia, and incontinence. He has no sense of smell, little appetite, a constant ringing in his ears, double vision, and blurred vision. He fatigues easily. He limps because his left leg is now about one inch shorter than his right leg due to a tilted pelvis. His face is now somewhat asymmetrical. He may have future problems with his urethra. Fahy used to lead an active life which included such things as working as much as he could and playing on softball and soccer teams. He now cannot undertake any strenuous activity and does little besides watch television and help his mother around the house.

The size of a verdict in and of itself does not indicate that a verdict is a result of passion and prejudice, without some additional showing that there was some trial incident or error which would have engendered the passion or prejudice. *E.g., Blevins v. Cushman Motors,* 551 S.W.2d 602, 615 (Mo. banc 1977). Because Dresser makes no attempt to argue that some incident at trial caused the jury to act out of passion or prejudice, there is nothing to indicate that the $3,000,000 verdict here

was the result of such improper considerations. Given Fahy's grave injuries, the extensive medical procedures and therapy he has had to undergo, and the effect the injuries have had on his life, a $3,000,000 verdict is not excessive.

 This Court also rejects Dresser's alternative argument that the judgment should have been reduced by the amount of the settlement between Fahy and Teledyne Wisconsin and Allied Construction. This allegation of error was not preserved for appellate review because it was not presented to the trial court in a motion for new trial. *See* Rule 78.07; *McConnell v. Pic–Walsh Freight Co.*, 432 S.W.2d 292, 301 (Mo.1968).

The judgment is affirmed.

RENDLEN and HIGGINS, JJ., concur.

ROBERTSON, J., concurs in result.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed.

DONNELLY, J., dissents in separate opinion filed.

WELLIVER, J., dissents in separate opinion filed.

BLACKMAR, Justice, concurring in part and dissenting in part.

I am not fully satisfied that the error in initially admitting the reconstruction testimony was cured by an instruction to disregard. The trial court essentially allowed the plaintiff to make a mid-trial summation on a vital issue. But I defer to the trial court's conclusion that mistrial was not necessary.

The principal opinion convinces me that a submissible products liability case was made. Causation is demonstrated within the requirements by *Jackson v. Kruse*

*Const. Co.*, 708 S.W.2d 664 (Mo. banc 1986).

I am not persuaded that the method of submission for design defect cases suggested by Judge Donnelly is superior to the submission prescribed by MAI 25.04. In this connection I note the comments by Professor Nicolas P. Terry, "Stricter Products Liability," 52 Mo.L.Rev. 1, 55 (Winter, 1987), who makes some observations similar to Judge Donnelly's. We place great responsibility on the jury in products liability cases. All of the factors suggested by Judge Donnelly may be presented to the jury, in support of the position that there is no "defective condition unreasonably dangerous." In some jurisdictions the jury is charged in greater detail. *See* 3 Devitt, Blackmar & Wolff, *Federal Jury Practice and Instructions*, 4th Ed., Sections 82.03, 82.06, 82.08. The additional instructions lack legal precision and may assume an argumentative tone. I see no reason to make a change.

Just as the court of appeals does, however, I believe that the trial court was required to reduce the judgment by reason of the settlement with the other defendants, in accordance with Section 537.060, RSMo 1986. The error is not waived by failure to include it in a motion for new trial because it does not require a new trial and could not be corrected by the granting of a new trial. It is also the plainest of plain error.

I would modify the judgment to allow the credit, and affirm as modified.

DONNELLY, Justice, dissenting.

I respectfully dissent.

First, it defies common sense to permit the jury to conclude that, had this machine been designed with a kill switch, such a device would not have been removed sometime during the roller machine's thirty years of use.[1]

---

**1.** The appeals court noted the modifications to the roller:

> The evidence revealed that the operator's seat and guard rail were removed and a tool box substituted for the operator's seat; the original engine had been replaced with a

more powerful engine, which resulted in the control panels being moved from in front of the operator to the exterior right side of the machine; the operator's steel platform floor had been cut away, exposing the back roller; the automatic cleaning system was not work-

Second, in my view, this case points up the need to limit or redirect the cause of action we first espoused in *Blevins v. Cushman Motors*, 551 S.W.2d 602 (Mo. banc 1977), else the parameters of recovery for a defective product design will be skewed too far to the protection of the user or consumer. *Cf.* Holford, *The Limits of Strict Liability for Product Design and Manufacture*, 52 Tex.L.Rev. 81 (1973) (general articulation of policies undergirding limitations on product liability). I continue to maintain "a court should strive for fairness 'in assigning rights and duties and in defining the appropriate division of social advantages.'" *Lippard v. Houdaille Indus., Inc.*, 715 S.W.2d 491, 500 (Mo. banc 1986) (Donnelly, J., dissenting) (quoting J. Rawls, *A Theory of Justice* 10 (1971)). To this end, I would give conceptual content to "unreasonably dangerous", *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 378 (Mo. banc 1986) notwithstanding.[2]

Courts have grappled with the "unreasonably dangerous" component in design defect cases because section 402A was "drafted at a time when manufacturing defects were perceived as the primary sources of causes of action in strict liability." P. Sherman, *Products Liability for the General Practitioner* § 7.16, p. 222 (1981). Determining at what point a "reasonably dangerous product design" becomes one "unreasonably dangerous" also is complicated by abstract and speculative notions of what could have been done to a product to make it "not unreasonably dangerous". For the majority, when that focal point is reached is left to the fact-finder's prerogative. This renders irrelevant the question whether the designer is *legally* responsible and merely invites, for all we know, an arbitrary jury determination.

It must be remembered that to speak of reasonableness is to speak of shades or degrees of status. The concept always has suggested balancing rather than static observation. *Cf.* Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication*, 73 Colum.L.Rev. 1531, 1540 (1973).[3] Taken as true, I would adopt the following nonexclusive list of factors to apply in defective design cases to determine whether, *as a matter of law*, a claimed danger in a product's design is unreasonable, emphasizing that the focus is on the product itself:

1. What is the product's utility to the general public? [4]

2. What is the likelihood that the product, as designed, will cause injury? [5]

3. Are there less unsafe alternative designs available? [6]

4. Can alternative designs be pursued without impairing the product's usefulness,

---

ing, which required the operator to perform pedal or manual roller cleaning either with the operator's foot on the roller while the roller was moving or with his hand while positioned on the ground; and, the emergency brake once broken had not been repaired. 740 S.W.2d 635, 637 (Mo.App. [E.D.], 1987).

**2.** That this may be a "'hook in a transcendental lure that will snag an appellate court'", *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d at 378 (citations omitted), can be no worse than appellate review without clear choice of standard, as this conjures a fishing excursion with rod and reel but no line.

**3.** Professor John Wade has observed that "a coherent analysis in design defect cases requires a balancing process. An absolute test for liability is not feasible unless one seeks to impose an insurer's liability." Wade, *On Product "Design Defects" and Their Actionability*, 33 Vand.L.Rev.

551, 570 (1980); *compare Azzarello v. Black Bros., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978) (manufacturer the guarantor of product's safety).

**4.** Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss.L.J. 825, 837 (1973).

**5.** This will be recognized as a derivative of Judge Learned Hand's much-cited formulation in *Conway v. O'Brien*, 111 F.2d 611, 623 (2d Cir.1940), *rev'd on other grounds*, 312 U.S. 492, 61 S.Ct. 634, 85 L.Ed.2d 969 (1941), whether "the cost of injuries [a product] will cause, discounted by the probability that they will occur, exceeds the cost of eliminating the risky features." Holford, *The Limits of Strict Liability for Product Design and Manufacture*, 52 Tex.L. Rev. at 92 (citing *Conway*). See also *Wade, supra* note 4 at 837.

**6.** *See Wade, supra* note 4, at 837.

with respect to function, or feasibility, reference cost? [7]

5. Is the claimed danger open and obvious to the user of the product, or is the dangerous character of the product widely regarded by the general public? [8]

6. If the product has been modified after leaving the manufacturer, did such modifications increase the likelihood of injury?[9]

I would reverse and remand for consideration of the submissibility question in light of the above.

WELLIVER, Justice, dissenting.

I respectfully dissent.

Our jurisdiction to transfer this case from the court of appeals is set forth in Mo. Const. art. V, § 10.

Cases pending in the court of appeals shall be transferred to the supreme court ... because of the general interest or importance of a question involved in the case, or for the purpose of reexamining the law, or pursuant to supreme court rule.

Rule 83.03 provides:

In any case in which a motion for rehearing has been overruled and an application for transfer under Rule 83.02 has been denied, the case may be transferred by order of this court on application of a party for any of the reasons specified in Rule 83.02, or for the reason that the opinion filed is contrary to a previous

decision of an appellate court of this state.

The reasons for transfer specified in Rule 83.02 are: "because of the general interest or importance of a question involved in the case, or for the purpose of reexamining the existing law."

In neither the Court of Appeals, Eastern District opinion nor in the principal opinion does there appear grounds for transfer of this case as specified in the Constitution and our Rules. This is but another of this Court's transfers for the sole purpose of changing the result. The result reached by the principal opinion with reference to this "cannibalized" roller with hardly a identifiable part remaining cannot do other than mark Missouri as the favorite state in which to file lawsuits and the state to be most avoided by those who would manufacture durable goods.

I adopt the opinion of the Eastern District Court of Appeals as my dissenting opinion. The opinion authored by James A. Pudlowski, Presiding Judge, and concurred in by Crandall, Jr., J. and Karohl, J., follows verbatim.

"Respondent Terrence J. Fahy obtained a judgment in a jury tried case in the Circuit Court of the City of St. Louis against Dresser Industries, Inc. (Dresser), in a products liability action.[1] On appeal, Dresser contends that the trial court erred: (1) in submitting the case to the jury because there was no evidence the alleged

---

7. *Id.*

8. *Stevens v. Durbin–Durco, Inc.,* 377 S.W.2d 343, 347–48 (Mo.1964); *see also Wade, supra* note 4, at 842–43; Restatement (Second) of Torts § 402A comment i (1965). Circumstances underlying a cause may point up "patent perils" inherent in a product or its use; these circumstances need not amount to an assumption of risk to be "material to the issue whether a product is 'unreasonably dangerous.'" *McGowne v. Challenge–Cook Bros., Inc.,* 672 F.2d 652, 663 (8th Cir.1982). This follows from the common sense notion that one who purchases or uses a product presenting open and obvious dangers doubtless has entertained whether the risk of harm is outweighed by the benefits of use or purchase, and concluded that it is. *Delvaux v. Ford Motor Co.,* 764 F.2d 469, 474 (7th Cir.1985).

9. In my view, this suggested component is equally pertinent to the "unreasonably danger-

ous" determination as the "open and obvious" inquiry noted above. Modifications not amounting to "substantial change" as characterized in Restatement (Second) of Torts § 402A comment p (1965) still may be relevant to the larger question. It should be recognized that, while it may be fair to require the manufacturer to conduct "an open-ended evaluative task that requires him to anticipate every injury that any use of his product might cause", *Holford, supra* note 5 at 84, it is patently unfair to require him to anticipate risk-incrementing alterations effected once the product has been sold. If the subsequent modifications become an efficient cause of injury, this should enter the equation.

1. The jury found for co-defendant Machinery, Inc., the alleged seller of the defective asphalt roller.

defect caused respondent's injuries, in that there was no evidence the product was in substantially the same condition at the time of the accident (1979) as it was when sold by Dresser (1950), and in that there was no evidence the product was being used in a reasonably anticipated manner at the time of the accident; (2) by not declaring a mistrial after the reception of inadmissible testimony; (3) by not declaring a mistrial after allegedly improper closing argument by respondent; (4) by refusing to allow appellant to read certain of respondent's abandoned pleadings; (5) in allowing testimony which lacked foundation by an expert witness; (6) by not granting a new trial on the basis of newly discovered evidence; and (7) by not granting a new trial based on an excessive verdict, or in the alternative, by not reducing respondent's award by the amount of the settlement between respondent and dismissed co-defendants Teledyne Wisconsin Motor and Allied Construction Equipment Company. We reverse because we find that appellant failed to make a submissible case on the element of causation. As a result, we do not address the remaining issues.[2]

### I.

"The evidence revealed that in 1950, Galion Iron Works and Manufacturing Co., later acquired by Dresser, produced an asphalt roller. Defendant Dresser stands in the position of original manufacturer. Years later, respondent's employer, County Asphalt, acquired it. While in the possession of County Asphalt, the used roller underwent numerous changes. The evidence revealed that the operator's seat and guard rail were removed and a tool box substituted for the operator's seat; the original engine had been replaced with a more powerful engine, which resulted in the control panels being moved from in front of the operator to the exterior right side of the machine; the operator's steel platform floor had been cut away, exposing the back roller; the automatic roller cleaning system was not working, which re-

quired the operator to perform pedal or manual roller cleaning either with the operator's foot on the roller while the roller was moving or with his hand while positioned on the ground; and, the emergency brake once broken had not been repaired.

"On August 23, 1979 respondent was the operator of this cannibalized roller. His principal duty that day was to compress previously spread pea gravel onto hot oil with the roller. Depositional testimony by plaintiff's witness, Scott Thoele, respondent's co-worker, indicated that five minutes before the accident he saw respondent cleaning the roller and the last time he saw the respondent was a minute or two before the accident, running the roller up and down the straightway. He further testified that respondent was standing while operating the roller. The depositional testimony of plaintiff's witness, Kent Thoele, another co-worker was that the last time he saw the respondent was not more than a minute before the accident and Fahy was down on the ground cleaning the roller wheels and the engine was not running. No one saw the accident actually occur, nor does the plaintiff recall how it happened. Rather the various witnesses testified as to seeing plaintiff lying injured on the roadway, the roller proceeding away from the plaintiff at a speed of three to five miles per hour approximately 150 feet toward a grassy area. Two men chased after the roller. One of them caught up to it and 'hit the kill switch' which stopped the roller in a 'couple of feet.' The plaintiff was severely injured.

"At trial, the plaintiff presented Boulter Kelsey the ubiquitous expert witness. Plaintiff presented a very lengthy hypothetical question to Kelsey to prove product defect(s) and causation of the injury. The pertinent inquiry for this opinion follows:

> (Attorney for Plaintiff): Assume, ... that the last men to see Mr. Fahy (plaintiff) ... testified that the roller's engine was off and that the operator has to put

---

**2.** However, regarding the alternative contention to point relied on #7, we invite the parties attention to RSMo 537.060 (1984 Supp.) which states that settlement agreements *shall reduce* the claim by the stipulated amount of the agreement. (Emphasis provided).

the roller in gear for the roller to move; ... that the roller wouldn't run over the operator if the operator had started it from the ground inadvertently leaving the roller in gear with the direction level engaged; ... that the roll [sic] control panel was on the right side of the roller if the operator were in the operating position facing the power roll [sic] and this machine was manufactured, designed, and sold in such a way in the event the operator left the operating position it would continue to roll under its own power without any human agency; ... the last time [Scott Thoele] saw [Fahy] before he was discovered on the ground, Scott Thoele saw him on the roller; ... when [the engine] was shut off [the roller] came to a stop in a couple of feet; ... the roller [was] traveling ... at approximately a walking speed, or some two miles per hour.... Assume further that the roller was not designed with an emergency control device that would effectuate its cessation in the event the operator left the operating position.

(Attorney for plaintiff): Let me ask you the following questions, if I may. Do you have an opinion, first, within a reasonable degree of scientific certainty, as to whether or not the roller I've described in this incident is defective and unreasonably dangerous for its intended use?

(Attorney for Defendant): Before he answers, Your Honor, in addition to the same objection I made previously, I would also like to point out that in my opinion Mr. Dowd has assumed facts that are either not in evidence or that he has mischaracterized facts that are into evidence.

Further, he has omitted facts that are in evidence. For example, he has omitted in his hypothetical question that the plaintiff was seen one minute prior to the accident on the ground cleaning the roller. That fact, along with other facts is omitted, and I feel that makes the question improper.

"The court took the objection under advisement as he did to previous objections made in limine and after plaintiff's attorney asked for another opinion of the expert, the court asked plaintiff's attorney to restate the question. Plaintiff's attorney again posed this question, "Whether or not he had an opinion, within reasonable degree of scientific certainty, whether or not this machine was defective and unreasonably dangerous as designed and manufactured?"

"The witness replied that "the machine is defective in design ... because it does not have a control which will stop the machine in case the operator leaves the operating position. That is the defect in this machine." He continued, after objection, that "the defect was a direct cause of the incident ... because given all the facts that we have about the accident, had the roll [sic] stopped when Mr. Fahy left the operating position, it would not have rolled over him."

"The expert witness stated: "[T]he machine was unsafe since the control system did not incorporate a deadman control such that the machine would be stopped if the operator, for whatever reason, was incapable of being present on the machine." Kelsey explained the workings of various deadman systems. One system was a foot treadle that the operator would be required to hold down in order to run the machine. Once the operator's foot left the position, the treadle would spring upward and disengage the drive and/or apply the brake. The witness stated that the same deadman concept could be applied to the operator's seat. Further, he discussed a spring loaded directional lever control which would require the operator to grasp the control so that when the operator let go, the lever would spring back into neutral and deprive the roller of its power. The witness did not say whether this would also engage the brake nor did he opine an estimate as to the distance it would take to stop the roller after the mechanism was activated.

"Plaintiff's expert witness went on to provide an extended detailed accident reconstruction testimony. Dresser requested an order in limine, prior to the expert's taking the stand, to prevent Kelsey's recon-

struction testimony because it would be based on speculation and conjecture. The trial court stated that he was going to permit the testimony but "since he did not know what Kelsey was going to say," he told Dresser's counsel, "if you are correct ... and if at some point in time I sustain the motion, one of two things is going to occur. Either, (a) mistrial or (b) the case is over,"—a directed verdict. Dresser renewed its objection at the close of plaintiff's case. The trial court sustained Dresser's objection at the close of the entire case, but contrary to its previous declaration, neither declared a mistrial or granted a directed verdict. Rather, the court instructed the jury to "disregard the witness's testimony as to how the accident occurred and any opinions based on that as there was no evidence to support the reconstruction testimony." It permitted the expert's testimony as to the defect and the unreasonably dangerousness of the product to stand.[3]

## II.

"Before addressing the substantive legal issues, we must consider the contention of the plaintiff that Dresser failed to file a motion for a directed verdict at the close of all the evidence, and therefore these issues have not be preserved for review. Plaintiff contends that since Dresser submitted and argued such a motion before the close of all the evidence it was ineffective to preserve review.

"On the morning of the last day of trial, after conference where instructions were prepared and the motions for a directed verdict argued in camera, the trial court called for the jury and allowed brief rebuttal evidence by plaintiff. This was done as a matter of accommodation and judicial efficiency to which plaintiff's attorney did not object. Hypertechnically, plaintiff is

correct, but we see no prejudice in the judge's decision not to first call the rebuttal witness for plaintiff, and then waste the jury's time by breaking for a lengthy instructional and motion conference.[4] The purpose of requiring the motion is to afford the trial court the opportunity to rule on the issues at that stage of the proceedings. That was done and the issue of submissibility was not waived. We deny respondent's motion to dismiss.

## III.

"Where failure to grant a directed verdict for Dresser is the error asserted, we must determine whether or not plaintiff presented substantial evidence at trial supporting his theory of recovery. In reaching this determination, we must review the evidence in the light most favorable to the respondent, giving him the benefit of all reasonable inferences, and disregarding the appellant's evidence except as it aids the respondent's case. *Strebler v. Rixman*, 616 S.W.2d 876, 877 (Mo.App.1981).

"Missouri has adopted the Restatement (Second) of Torts, § 402A (1976) as its standard of liability in products liability cases. *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 364 (Mo.1969). One essential element that the respondent must prove in a products liability case is that the defect in the product was the proximate cause of injuries sustained by plaintiff while he was using the product in a reasonably anticipated manner. *Garrett v. Joseph Schlitz Brewing Co.*, 631 S.W.2d 652, 654 (Mo.App.1982). M.A.I. 25.04 (1978). As Judge Billings said in *Nesselrode*, "although obviously abbreviated, the foregoing explanation describes the heart and soul of a strict tort liability design defect case—unreasonable danger and causation." *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 376 (Mo. banc 1986).[5] The

---

**3.** We believe that the reception of the inadmissible evidence was prejudicial to Dresser. Because we make disposition of this appeal on Dresser's first point, we will not address this contention.

**4.** The rebuttal testimony consumed slightly more than two of 962 pages of transcript.

**5.** In strict product liability cases, the tortious aspect of the defendant's conduct or activity is the defect in the particular product, and it is clear that the defect *must* be the cause of the injury. Richard W. Wright, Causation in Tort Law, Calif.L.R., Vol. 73, No. 6, p. 1770, Dec. 1985.

dispositive issue in this appeal is whether the plaintiff's evidence proved that the alleged defect caused the injury. We believe that in two regards, it did not.

## A

"Plaintiff's evidence revealed that the last witness to see the respondent was "less than a minute before the incident and at that time plaintiff was on the ground cleaning the roller wheel and the engine was off." No one saw the accident and plaintiff cannot and did not explain how the accident occurred. The trial court struck the expert witness's reconstruction testimony. So we must look solely to expert's testimony to determine if there was substantial proof the defect caused the injury. For that endeavor we look closely at his testimony and specifically at the question and reply to plaintiff's attorney's hypothetical question.

"The facts upon which an expert's opinion is based, like the facts sufficient to support a verdict, must measure up to the legal requirements of substantiality and probative force and the question whether such opinion is based on and supported by sufficient facts or evidence to sustain the same is a question of law for the court. *Craddock v. Greenberg Mercantile*, 297 S.W.2d 541, 548 (Mo.1957). Mr. Kelsey's opinion does not measure up to these standards. Of course, an expert's opinion is in the nature of a conclusion of fact, but it must have a substantial basis in the facts actually established. We therefore meticulously review the expert answers and the hypothetical.

"Mr. Kelsey was asked to assume that the plaintiff was last seen *on* (emphasis added) the roller and the roller engine was off, that no one actually had seen the incident and that the plaintiff's body was lying face down and severely injured. He then was asked whether he had an opinion within a reasonable degree of scientific certainty of whether or not this machine was defective and unreasonably dangerous as designed and manufactured. His answer:

"In my opinion the machine is defective in design." "Why do you have that opinion?" His answer: "because it does not have a control which will stop the machine in case the operator leaves the operating position. That is the defect in this machine." In reply the plaintiff's attorney asked, will the machine "continue to operate without the operator in the operating position?" His answer "that's correct." Later, he said: I believe that "The defect was the direct cause of this incident."

"These conclusions were entirely too tenuous. They were not supported by plaintiff's own evidence and are either speculative or immaterial. The evidence clearly indicates that the plaintiff was last seen on the ground prior to the accident with the engine off. There was no evidence that plaintiff left his operating position.

"Respondent contends that Scott Thoele testified that he saw plaintiff on the roller and operating the machine one to two minutes before the accident and we should ignore his brother Kent's testimony that the plaintiff was on the ground and the engine was not running. If we were to do that then we must also recognize that when Scott saw plaintiff, he testified the "plaintiff was standing and operating the roller." Plaintiff is not bound by the testimony of any one of his witnesses, if such testimony is contradicted, but they are bound by the uncontradicted testimony of their witnesses. *DeLay v. Ward*, 262 S.W. 2d 628, 633 (Mo. banc 1953). *Stark v. American Bakeries Co.*, 647 S.W.2d 119, 121 (Mo. banc 1983).

"These facts are crucial to the answer of plaintiff's expert to the question of how this accident happened and why the defect caused the injury. He replied "Mr. Fahy (plaintiff), *according to the witnesses*, had finished cleaning the roll at sometime prior to the accident and *had climbed up onto* the rolling machine to start it, to move it, *because* had he started it on the ground he would *not* have been run over. In other words, if he'd been down on the side of the machine and started it and the machine had

been in gear, it would not have run over his body." He reiterated that "it's my belief he was on *top* of the roller when the accident scenario began." (Emphasis added).

"We repeat, there was absolutely no evidence that the plaintiff was on top of the roller just prior to the incident which was the keystone to the expert's conclusion and the gravamen of the plaintiff's claim.

"This unwarranted assumption was not supported by the evidence. However, it was the basis of the gravamen of plaintiff's claim. Without it, the expert's conclusions are not sufficient. We realize that from the evidence many scenarios could be theorized which could be assumed by inferences, guesswork and surmise. When the cause of an injury is left to speculation and conjecture and when sound reasoning does not point to the liability of the defendant there may be no recovery.[6]

### B.

"Our holding above alone is sufficient grounds to reverse. However, there is a second, independent ground for reversal which we will address in reply to plaintiff's contentions. There is no evidence to support "but for" causation. We cannot infer that had Dresser installed a deadman switch, a device that causes the machine to come to a stop when the operator leaves a safe position, that plaintiff's injuries still would not have occurred. This is because we have positively no evidence of how or where plaintiff came into contact with the roller and whether any deadman switch would have served to bring the machine to a halt before it ran over plaintiff.[7]

"Plaintiff vigorously disagrees. First, he contends that it is not his burden to prove that the roller could have been rendered safer than it was. To support his position, he cites *Elmore v. Owen–Illinois, Inc.*, 673 S.W.2d 434 (Mo. banc 1984). Specifically, he refers to this passage:

> Thus, plaintiffs established that Kaylor was "defective" when they proved that it was unreasonably dangerous as designed; they were not required to show additionally that the manufacturer or designer was "at fault," as that concept is employed in the negligence context.

*Id.* at 438.

"Plaintiff mischaracterizes the import of *Elmore*. *Elmore* held that "state of the art" evidence has no bearing on the outcome of a strict liability claim; *Id.* at 438. In *Elmore*, the defendant had argued that there was insufficient evidence to support a finding of defect since it could be shown

---

**6.** A recent opinion of the District Court of Appeals of Florida, Second District presents similar facts. There the court noted:

> The plaintiff sustained head injuries when he fell, and he has no recollection of what caused the accident. One coworker was present at the time of the accident, and testified that the plaintiff was on the platform which was being raised or had been raised to its extended position when the coworker turned away to look at something across the street. When he heard a noise, he turned back around and saw plaintiff falling through the air. He did not see what caused the fall. There is no indication in the record of how long a time passed between the coworker looking away and the beginning of the fall. There, the plaintiff urged that it had to be assumed that plaintiff was standing on the platform inside the railing and for some reason, he fell. Causation occurred in that the railings were too low to prevent this fall. The court noted, like the case at hand, that equally reasonable assumptions were possible, such as the

plaintiff sitting, standing or climbing on the railing, in which case, the higher railings would not have prevented the fall. *Adkins v. Economy Engineering Co.*, 495 So.2d 247, 248 (Fla.App. 1986).

**7.** In his brief, plaintiff asserts that the defect was not the failure to install a deadman's switch, but, rather, that the roller would continue to operate with the operator not in the operating position. We find this to be a distinction without a difference. First, throughout trial, plaintiff centered his thrust on the failure to install a deadman switch (e.g. Boulter Kelsey's lengthy discussion on types of deadman's switches and the argument that a 10¢ spring would have prevented the accident). Second, how else does a roller stop when the operator leaves the operating position? Perhaps there are other names for emergency stopping devices which sense that the operator no longer is in the operating position and therefore cause the cessation of locomotion but the theory is still the same.

that, at the time of manufacture, defendant could not have known of the product's unreasonable danger. *Id.* at 437. Dresser does not argue here that it could not have known of the harm the Galion roller could cause when it was made in 1950 and therefore state of the art, as applied to the issues of this case, is irrelevant. The issue is causation.

"Plaintiff then asserts that he did adduce sufficient evidence for the jury to infer that the deadman switch would have prevented the accident. First, he says that the witness who ran after the machine, which was traveling three to five miles an hour, testified that when he turned it off, it stopped in a couple of feet.[8] While plaintiff believes that that evidence in and of itself was sufficient, he ignores the key fact that there is no evidence that respondent's body was more than "a couple of feet" away from the roller wheel or when a deadman switch, if present would be triggered. Certainly had the evidence indicated respondent had been a good distance away, a jury could infer that "a couple of feet" stopping distance was sufficient to establish causation. But, here, the jury could only speculate where and how respondent came into contact with the roller. When the roller began operating without the operator in the operating position was he far enough away so that, had there been a deadman's mechanism it would have stopped the roller in time? Or was he so close to the roller that a deadman's mechanism would not have stopped the roller soon enough to save him? In fact, was his position such that an emergency stopping device would have resulted in the roller coming to a stop upon the respondent? The evidence does not permit a finding of fact on these questions.

"Respondent's second bit of evidence is the testimony previously stated of his ex-

pert who, in response to counsel's question opined:

Q. Do you have an opinion within a reasonable degree of scientific certainty whether that defect you just described and that defect of the unreasonably dangerous design of this machine was causally connected with the plaintiff being run over by the roller?

MR. PERRYMAN: Same objection.

MR. BECKEMEIER: We join.

THE COURT: Very well. It's overruled. You may answer.

THE WITNESS: Yes, I believe that the defect was the direct cause of this incident.

Q. (By Mr. Dowd) Why is that?

A. Because, given all the facts that we have about the accident, had the roll [sic] stopped when Mr. Fahy left the operating position, it would not have rolled over him.

"His answer is predicated on "all the facts that we have about the accident" and that "Mr. Fahy left the operating position." His predicament is that he did not have "all the facts" nor have any evidence when or if he left the operating position. "An expert's opinion as to the cause of damage must be a conclusion of fact and must have a substantial basis in the facts actually established by the evidence." *Garrett,* 631 S.W.2d at 655. Once the expert's reconstruction testimony was stricken, all that remained is evidence the roller can be stopped in a couple of feet and an injured plaintiff, who if he fell at all, fell either within or outside the stopping distance.

"Respondent calls our attention to *Uder v. Missouri Farmers Association, Inc.,* 668 S.W.2d 82 (Mo.App.1983). While that case involved expert testimony and circumstantial evidence to allow the jury to infer defect and causation, the case is distin-

---

**8.** What his deposition actually stated was:
Question: How far did the roller go after you hit the kill switch?
Answer: Just stopped or—a couple of feet—or—
Question: Was it on grass or something?

Answer: Yes, It was.
We do not believe that the above is sufficiently precise to have any significant probative value; especially in light of the fact that the roller was stopped by throwing the gear into reverse.

guishable since, unlike here, there was substantial evidence to support the inferences. There, the deceased was found entangled in the plastic shield of the power take off of a fertilizer spreader. The expert based his conclusion on the examination of parts of the equipment and the twisting damage of the shield.[9]

"Plaintiff's reliance on *McClanahan v. Deere & Co.*, 648 S.W.2d 222 (Mo.App.1983) is also misplaced. Even though there were no eye witnesses to the accident, there was substantial evidence for the jury to infer that a "hair-line crack" in the switch on a combine header caused the accident. In *McClanahan* there was evidence by an expert witness and a lay person who testified to the hair-line crack and the reaction of the combine header when the switch was bumped. Our brethren in the Southern District concluded that there was sufficient evidence to show causation.

"Plaintiff also cites us to *McGowne v. Challenge–Cook Bros., Inc.*, 672 F.2d 652 (8th Cir.1982) for the proposition that an unwitnessed fall is properly submittable as to defect and causation. *McGowne*, however, is distinguishable as it was tried as a failure to warn and not a design defect case. *Id.* at 658. As the Eighth Circuit concluded "it could reasonably be inferred from the *evidence* that in the *absence of a warning* a worker could fall into the charging hopper and be injured." *Id.* at 662. (Emphasis provided). Here again, although this is a failure to warn case, the court concluded there was sufficient evidence to support an inference for the jury that the manufacturer failed to warn.

"Plaintiff next brings to our attention the recent case of *Klein v. General Electric Company*, 714 S.W.2d 896 (Mo.App. 1986) where this court said "[t]he testimony of an expert that a defect in a product was the probable cause of an incident may constitute substantial evidence." *Id.* at 900. We strongly agree. The distinction, between the case *sub judice* and *Klein*, however, is that, in *Klein*, the expert testified that a safety device, which detects the temperature of a coffeemaker and shuts off the flow of electricity when the temperature reaches an unsafe level, did not work properly. He further testified that failure to stop the flow of electricity can overheat the coffeemaker and ignite it and the adjacent flammable materials. *Id.* at 901. It is reasonable for a jury to infer that this mechanical failure of the safety device to detect and stop the flow of electricity caused the fire. This is unlike this asphalt roller, where we have no evidence for the jury to infer that a safety device could have disengaged the power drive and overcome the inertial forces to stop the movement of the roller and not cause the injury. Further, it must be noted that the expert in *Klein* based his testimony on, among others, two vital laboratory experiments. As a result of the tests the expert testimony in *Klein* was based on facts which constituted substantial evidence. Here, there were no experiments save the results of an experiment on another roller, *not introduced into evidence* by Fahy, which indicated stopping distance of five to ten feet. In fact, as the *Klein* court taught, expert testimony is not always substantial evidence, but rather, it "may constitute substantial evidence."

"The issue is further complicated by the alterations made by County Asphalt on the roller. The changes may not be superceding causes. However, the fact that an operator would have to lean over to the side of the machine to adjust the controls, or that he had to sit on a toolbox or stand instead of sitting on a seat with a rail, or the fact that manual cleaning of the machine was necessary, or the fact that part of the operator's platform was cut away,

---

Also, when stopped, the roller was on grass, not asphalt.

9. No test was performed on the roller. Soon after the accident it was dismantled. Interestingly, Boulter Kelsey, respondent's expert, had run tests on another roller. These tests, using a switch rigged to the ignition switch, indicated that the stopping distances ranged from five to ten feet.

exposing the operator to the rear wheel, or that he could start the roller while standing on the ground means that a jury would be even less able to infer that the roller would have come to a stop in time to prevent the accident.

"In summary, as plaintiff's witnesses' opinion on causation was not based on evidence in the record and as there was no evidence for a jury to determine whether plaintiff came into danger within or beyond the possible stopping distances of a roller equipped with a deadman's switch, plaintiff failed to make a submissible case that the defect caused plaintiff's injury. As plaintiff failed to establish the necessary element of causation, we reverse and enter judgment for Dresser."

I do not believe that evidence upon which two courts can differ to such a wide degree is either the type of evidence, the quantum of evidence or the quality of evidence which we should say is sufficient to justify saddling anyone with $3.0 million of liability.

The cause should be retransferred to the Court of Appeals, Eastern District as improvidently transferred for entry of and publication of the Court of Appeals opinion, or, this Court should reverse the cause and enter judgment for Dresser.