Goldie Evelyn McCLANAHAN and LaRita DeAnn McClanahan, a minor, by her Next Friend, Goldie Evelyn McClanahan, Plaintiffs-Respondents,

v.

DEERE & COMPANY, a Corporation, Defendant-Appellant.

No. 12650.

Missouri Court of Appeals, Southern District, Division Two.

March 8, 1983.

E.C. Curtis, Phillip R. Garrison, Farrington, Curtis, Knauer, Hart & Garrison, Springfield, Edison Kaderly, Lamar, for plaintiffs-respondents.

Jon Dermott, Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, for defendant-appellant.

PREWITT, Judge.

Plaintiffs, the wife and daughter of Robert L. McClanahan, sought damages for his wrongful death. He was killed when struck by moving parts of a combine manufactured by defendant. Plaintiffs contend this occurred due to a defective switch on the combine. A jury awarded plaintiffs $300,-000 and judgment was entered accordingly.

Defendants contend here that appellants failed to make a submissible case, that the trial court erred in admitting certain answers to interrogatories in evidence and in refusing to permit defendant to present the testimony of an expert witness who defendant had added to its answers to interrogatories five days before trial. We deny these contentions for the reasons stated.

■ We first discuss whether plaintiffs made a submissible case. In making that determination the evidence and its reasonable inferences are considered in the light most favorable to plaintiffs. *Ogle v. Webb*, 623 S.W.2d 582, 583–584 (Mo.App.1981). Plaintiffs submitted their claims on strict liability in tort. To make a case on that theory plaintiffs must prove that when the combine left defendant it contained a defect which made it dangerous when put to a use reasonably anticipated and that the combine was being used in a manner reasonably anticipated when decedent was killed as a direct result of the defect. *Rog-*

224

ers v. *Toro Manufacturing Company,* 522 S.W.2d 632, 637 (Mo.App.1975); *Higgins v. Paul Hardeman, Inc.,* 457 S.W.2d 943, 948 (Mo.App.1970). See also *Moslander v. Dayton Tire and Rubber Company,* 628 S.W.2d 899, 904 (Mo.App.1981).

Mr. McClanahan was a farmer who died November 5, 1979, from injuries he sustained when he became entangled in the header of his 4400 series John Deere self-propelled combine. He had purchased it new in 1977. On the day of his death, McClanahan was combining soybeans at the James Clubb farm. Chuck Clubb observed him cutting beans with the combine around 11:30 a.m. At approximately 12:15 p.m. Chuck Clubb again saw McClanahan and the combine. The combine was stopped although the engine was running. The header was raised and not operating. McClanahan waved at Chuck, walked over to about the middle front of the header and squatted down and looked into the header. Chuck then left the area. At approximately 1:00 p.m. McClanahan was discovered by his wife. Apparently he was dead when she arrived. His body was underneath the reel located on the header and entangled in the auger and sickle bar. The engine of the combine was running. Dirt was in the header and a small pile of dirt was in front of the header.

A "push-pull" switch, which plaintiffs contend was defective, turns on or off the components of the header. The header is located at the front of the combine. Its components are the reel, cutter bar, and auger. The reel picks up the crop and pulls it into the cutter bar which cuts it so that it falls into the auger. To operate the header the switch is pulled out and to shut it off, the switch is pushed in. An electromagnetic clutch controlled by the switch allows the header to be disengaged while leaving the rest of the combine running. The switch had not been altered since it was manufactured.

In cutting soybeans or other short crop, if the ground is uneven soil often gets in the header. By shutting off the header you can clean it by hand. The operator ordinarily leaves the separator on the combine running while he is cleaning out the header because if he turns it off, clogging can occur. The customary way of cleaning dirt out of the header is to take the clutch out of gear by using the switch so that the header stops, raise the reel, then get off the combine and clean it by hand with the engine and separator running. Plaintiffs contend that a defect in this switch allowed the header to start and strike McClanahan after he had disengaged it and started to clean dirt from it.

The switch is located on an instrument panel on the right side of the combine. The inner chamber of the switch is pushed or pulled, by means of the knob, along the outer chamber or casing. The top and bottom of the inner chamber fit snugly against the top and bottom of the casing. When the switch is pulled all the way out, the inner chamber fits into two "detents" or "dimples" in the casing. The detents hold the inner chamber in the "on" position. Similar detents hold the inner chamber in the "off" position when it is fully pushed in. Between the "full on" and "full off" position there is a space of approximately one-eighth inch described as an intermediate position.

Dr. Gibson, an expert witness for plaintiffs, testified that when the switch is in the intermediate position the header clutch may go off and then intermittently engage and disengage due to engine vibrations which makes it defectively designed for its function. He said that other types of switches adequate for this function were available. He said that while the switch was in the intermediate position with just a slight distance between the knob of the switch and a nut holding the switch to the instrument panel the header intermittently engaged several times with the engine running but no one operating the combine during tests that he supervised on the combine. Video tapes of this occurring during Gibson's tests were introduced in evidence and shown to the jury.

One of the people who came on the scene before decedent was removed was George

Walz. No one touched the controls of the combine until the coroner arrived. Walz then got in the cab to raise the reel to make it easier to remove the body. He noticed that the switch controlling the header appeared to be in the off position. He testified that the separator was in gear and he decided "to bump the starter and see if it is really in gear. I just bumped, turned on the key, bumped it and when I done that, the reel shook or jerked and I knew then something was wrong." He then shut the separator off and "started it up and raised the reel up and then killed it."

After decedent was removed, Walz drove the combine to the Clubb barn where it was going to be washed off. The header switch appeared to be in an off position and while he drove the combine toward the barn the reel and auger jerked two or three times. Until he started washing the combine he did not touch the switch. After partially washing it, he started the separator and then touched the switch and it "didn't feel like it was plumb off." He "leaned over and looked" and saw a "little hairline crack, you could just barely see daylight" between the bottom of the knob on the switch and a nut which holds the switch on the instrument panel.

After cleaning the combine Walz drove it to the McClanahan farm. While taking the combine there Walz pulled the switch out until there was a "hairline crack" and shortly thereafter the header jerked and tried to make contact. It did that three or four times within the quarter of a mile distance. He positioned the switch like he found it while he was washing it for Dr. Gibson's tests.

Defendant presented evidence that the switch would not return to "on" due to engine vibration but could be carefully placed in the intermediate position where heat from "the arcing process" would cause intermittent operation of the header.

Defendant contends that plaintiffs failed to make a submissible case because (1) plaintiffs did not prove that the defect alleged in the switch was the cause of Robert L. McClanahan's death as the evidence showed that the most likely cause of decedent's injuries was that the header was not functioning properly and decedent worked on it with the electromagnetic clutch engaged; and (2) because the combine was not shown to be defective when put to a use reasonably anticipated because defendant "could not reasonably anticipate that the switch would be carefully pushed to just the point where the header goes off and manipulated carefully down into an exact location, not fully down." Defendant contends that there was no "probative evidence that the design of this switch is defective", but "[e]ven if the alleged defective position of the switch could be shown to have existed at the time of the injury, respondents have not shown that the switch was being used in a manner anticipated by defendant."

■ As a part of this contention defendant contends that George Walz' testimony "is such as to require disbelief" and that reasonable minds could not differ about the probative value of his testimony. Walz is a close friend of the McClanahans. When one of plaintiffs' attorneys, who is also a close friend of Walz, asked him about the incident of Robert McClanahan's death, he said he told him what he observed. He could not say when he first told anyone that he noticed the "hairline crack" while washing the combine. He said he did not mention seeing it in his deposition because no one asked him about it. He testified that he did not say anything at his first two depositions about touching the switch as he drove the combine to the McClanahan farm. Why he did not was not asked or otherwise explained.

We believe that Walz' credibility was for the jury to determine. His testimony was consistent and positive and he was not clearly impeached. He may not have understood the importance of the position of the switch when he initially talked to plaintiffs' attorney.

■ The evidence showed that when the header accumulated dirt, as it often did when harvesting a short crop such as soybeans on uneven ground, the normal proce-

dure was to turn only the header off, climb out of the cab and clean it by hand. Dirt was in the header when decedent was found and the pile of dirt nearby indicated that the decedent was cleaning it. Because of the risk involved, it is unlikely that decedent would have tried to clean it with the header operating or if it had stopped operating that he would be cleaning or otherwise working with it without first believing he had turned the switch off. In cases where no eye witness to a fatal event is available, the jury may consider, along with the evidence, the natural instinct of men to avoid injury. *Gerhard v. Terminal Railroad Association of St. Louis,* 299 S.W.2d 866, 872 (Mo. banc 1957).

It is possible, as defendant contends, that the header was not functioning properly and decedent was working on it, knowing that the switch was engaged. However, because some dirt was apparently removed from the header and cleaning it was often necessary while cutting soybeans, we think it probable that he was cleaning dirt from the header when killed. Because of the obvious danger, it is doubtful that he would have started cleaning it with the switch engaged. If that had occurred, apparently someone would have had to have moved the position of the switch after he was found and before Walz observed it and the evidence indicates that did not occur.

The combine was being used in a manner anticipated. Defendant's evidence showed that it knew that dirt will accumulate on a header and that operators will remove it by hand after shutting off the header with the switch but leaving the separator running. Defendant, however, argues that it could not have anticipated that the switch would be left between the indentions which hold it in position and where the header would initially go off but then later start up.

It could be anticipated that the switch might not always be pushed in as far as it could go. Once the header went off, an operator might presume that the switch was pushed far enough, but a "hairline crack" might be left between the knob and the nut holding the switch to the panel.

There was evidence that when an operator would feel it disengage from the upper indention he could believe that the switch was in a position where it would stay off and that unless the operator leaned over to look at it, that the switch could appear to be fully depressed but not be. An operator might think that the switch was in a position where it would not allow the header to go back on and then would proceed to clean it by hand.

■ The evidence was sufficient for the jury to have found that the decedent was using the combine when dirt accumulated in the header and that he pushed the switch in until the header went off, but not far enough that it reached the indention that held it in the off position; that he got off the combine and was cleaning dirt out of the header by hand when engine vibration caused the switch to return toward the on position, starting up the header and resulting in his death. It sufficiently showed a defect which caused Robert L. McClanahan's death during an anticipated use. Plaintiffs made a submissible case.

Defendant next contends that the trial court erred in allowing plaintiffs' counsel to read certain interrogatories and their answers and certain portions of Dr. Gibson's deposition because the answers were prepared as part of the third-party action of defendant seeking indemnification from Cole Hersee Co. (Cole Hersee); were not admissions against interest; and because defendant was not allowed to explain the answers to the jury, thereby creating the false impression that defendant had judicially admitted that the switch was defective. Cole Hersee had sold the switch to defendant and defendant had filed a third-party claim against it. The third-party claim was severed from trial with plaintiffs' claim nine days before trial of plaintiffs' claim commenced.

Plaintiffs' counsel announced to the court that he intended to read certain of the interrogatories and answers to them. He also proposed to read from depositions of Dr. Gibson because the answers referred to them. Following defendant's objection and

a discussion outside the hearing of the jury, the judge announced he was going to allow it. The transcript then shows the following:

"MR. MARTIN [defendant's counsel]: Am I going to be permitted to tell that jury that up until a week and a half ago Cole Hersee was in this case?

THE COURT: No.

MR. MARTIN: How am I going to be able to explain that to the jury?

THE COURT: I don't know.

MR. MARTIN: It puts us in an impossible position.

(Whereupon the proceedings at the bench concluded and the proceedings returned to open Court)."

Plaintiffs' counsel then read from the interrogatories, their answers and portions of Dr. Gibson's depositions. This is fully set out below.[1] It appears that the key to

1. MR. GARRISON: Ladies and gentlemen, I would like to read to you at this point admissions against interest against Deere and Company from Cole Hersee Company's First Interrogatories to Deere and Company and Deere and Company's answers to those interrogatories.

The first page is the interrogatories from Cole Hersee Company to Deere and Company. These interrogatories are written questions that are submitted to Deere and Company. Those written questions start out with this statement—this is being submitted to Deere and Company:

'Comes now the third-party defendant, Cole Hersee Company, and propounds the following interrogatories to defendant, to be answered fully in writing and under oath within the time prescribed by law.'

---

The interrogatories start out with this introduction:

'In answering the following interrogatories, furnish all information which is available to you, including information in the possession of your attorneys, agents, and all other persons acting or purporting to act on your behalf or subject to your control. When a subsequent interrogatory depends upon your affirmative answer to a prior interrogatory, the subsequent interrogatory assumes that your answer to the prior interrogatory was in the affirmative.'

---

'Words derived from the root word "you", unless the context otherwise indicates, refer to the party to whom these interrogatories are directed and/or any agent, servant, employee, or other person acting or purporting to act on its behalf or subject to its control.'

---

The term 'the accident', unless the context otherwise indicates, refers to the accident in which Robert L. McClanahan died on or about November 5, 1979, and which is the basis for plaintiffs' petition filed herein.

---

The term 'the switch', unless the context otherwise indicates, refers to the electromagnetic clutch switch which was on the combine at the time of the accident.

---

MR. GARRISON: Interrogatory No. 1 was this:

1. Identify each person who has provided any information used in answering these interrogatories and state with particularity which interrogatories each person so identified supplied information for.

ANSWER: The following persons assisted in answering the interrogatories: C.D. Isaacson, Stan Liedtke, Duane Ziegler, Martin Berk and R.E. Anderson. Mr. Liedtke provided information for interrogatories 22, 23, 28 and 29; Mr. Berk provided information for interrogatories 11, 12, 20, 21, 32, 33, 34 and 35. Messrs Isaacson, Ziegler and Anderson in addition to assisting in the answering of the previously listed interrogatories worked on the remaining unlisted interrogatories.

---

MR. GARRISON: Interrogatory No. 5.

Prior to answering these interrogatories, have you made diligent inquiry of your attorneys, agents, and all other persons acting or purporting to act on your behalf or subject to your control who have any knowledge whatsoever regarding the subjects of these interrogatories in an effort to fully and accurately answer each of these interrogatories?

ANSWER: Inquiry was made of persons who answering defendant felt had the most knowledge regarding the subject of these interrogatories.

---

MR. GARRISON: Interrogatory No. 7:

Do you contend that Cole Hersee Company is or may be liable to you for all or any part of plaintiffs' claim against you as a result of any defect or defective condition of the switch?

ANSWER: Yes.

---

MR. GARRISON: Interrogatory No. 8:

With respect to each such alleged defective condition, please:

(a) Describe it in complete detail.

ANSWER: (a) See deposition of Donald Gibson.

(b) Describe when, where and how you first became aware of the alleged defective condition.

ANSWER: (b) See deposition of Donald Gibson.

---

resolving whether these interrogatories were admissions is interrogatory number 7. It asks defendant:

"Do you contend that Cole Hersee Company is or may be liable to you for all or any part of plaintiffs' claim against you as a result of any defect or defective condition of the switch?"

Defendant answered "Yes."

■ As lawyers we know that defendant's counsel did not wish to admit that a defect existed in the switch. However, we are not concerned with what the attorneys may have intended, but what defendant did in its answers to interrogatories. Why the statements were made and whether they were in connection with the third-party claim does not make them inadmissible if they were admissions. An admission against interest comprises any statement of a party inconsistent with his contentions in

an action. *Richardson v. Liggett,* 453 S.W.2d 249, 254 (Mo.App.1970). This can include answers to interrogatories made in other cases, even if a statement of an ultimate fact. *Wills v. Townes Cadillac-Oldsmobile, Incorporated,* 490 S.W.2d 257, 260 (Mo.1973). See also *Utley v. Tolfree,* 77 Mo. 307, 309 (1883).

■ Although the use of "any" before defect could cause the question to be interpreted as asking if defendant is contending Cole Hersee may be liable to it if there could be a defect in existence, it could also be interpreted as asking if defendant contends that a defect exists. The effect of the answers and the weight to be given them was for the jury to consider. The trier of fact has discretion to determine whether statements are admissions and the weight and value to be accorded them. *Cummings v. Tepsco Tennessee Pipe & Sup-*

With respect to each such alleged defective condition, please:
(c) State whether the alleged defective condition could have been detected by an inspection of the switch.
ANSWER: (c) No.

With respect to each such alleged defective condition, please:
(d) Describe the manner in which the alleged defective condition caused or contributed to the accident.
ANSWER: (d) See deposition of Donald Gibson.

MR. GARRISON: Ladies and Gentlemen, I will now read to you from the deposition of Donald Gibson. In his first deposition, pages 14, lines 7 through 25, and page 15, lines 1 through 8:
'Q. Now, what problem did you find it to be?
A. Well, the problem is a very, very simple one, and that is that switch may be positioned and will stay in an on or an off or an intermediate position in which it may both be on or off or at least a high resistance contact position.
Q. Did you take the switch off of the combine on that occasion?
A. No, I did not. I did not remove that because the fault in that switch was so obvious and so clear that I did not want to do anything to jeopardize the integrity of that circuit whatsoever before the investigation had been totally completed by all parties involved.
Q. Are you saying the switch itself was defective or are you saying it was of defective design?

A. I am telling you it was a defective design from the standpoint of function.
Q. Was there anything defective about the switch itself?
A. Well, if the switch is designed defective for its purpose then the switch is clearly defective. Now as far as mechanical breakage or any abuse, that switch is as good as a new one that you can buy. But it is just not suitable in any manner for the type of application in which it was used and therefore in that application is totally defective.'

MR. GARRISON: Reading from the same deposition, page 50, lines 16 through 20.
'Q. I take it your conclusion then was that the switch itself operated properly except that your opinion is that it was defectively designed?
A. The switch operates as it is designed to operate which is defective for this application.'

MR. GARRISON: Now reading to you from Dr. Gibson's second deposition, page 102, lines 6 through 15:
'Q. When it is in the threshold position, do you have an opinion as to why it comes on and off intermittently?
A. Yes, sir, I do.
Q. And what is that opinion?
A. The vibration of the console, which is inherent with the vibration of the engine when it is running, produces a movement of the flexible spring system that controls the sliding contact into a position where it will actually translate back and forth into contact and out of contact with the terminals of the switch.'
MR. GARRISON: Thank you."

*ply Corporation,* 632 S.W.2d 498, 501 (Mo. App.1982).

Answers to interrogatories are not true judicial admissions and may be explained or contradicted at trial. *In re Estate of Jeffries,* 427 S.W.2d 439, 444–445 (Mo.1968); *Smith v. Trans World Airlines, Inc.,* 358 S.W.2d 91, 94 (Mo.App.1962). The trial judge, however, did not prevent defendant from offering evidence explaining or contradicting the answers to interrogatories. Much of defendant's evidence did contradict them and the trial judge stated that counsel could "argue", apparently in closing argument, whether the answers were admissions. He ruled that the attorneys were not permitted to tell the jury that up until a week and a half ago Cole Hersee was in the case. Defendant does not explain to us and we do not comprehend how that would have been of any aid to defendant or would have enlightened the jury. It would not explain why the answers were not admissions and it is unlikely that such a statement would have meant anything to the jury. They already knew from the portions of the interrogatories and answers read by plaintiffs' attorneys that these were interrogatories from Cole Hersee to defendant. That defendant's claim against Cole Hersee had been removed from the issues being then tried a week and a half before would not lessen the admissions if they had been made. This point is denied.

Defendant's last point contends that the trial court erred in refusing to allow Angelo Introvigne to testify as an expert witness. Introvigne was the chief engineer of Cole Hersee, the third-party defendant. On November 30, 1981, the trial court severed defendant's third-party claim against Cole Hersee from trial with plaintiffs' claim. Cole Hersee had planned to call Introvigne as a witness in its defense of defendant's third-party claim. Defendant's attorneys first learned of him on December 3, 1981, apparently from Cole Hersee's attorney. On Friday, December 4, 1981, defendant

amended its answers to interrogatories to add his name as an expert witness and mailed them to plaintiffs' counsel. The amended answers to interrogatories were received by plaintiffs' counsel the next day. They were filed December 7, 1981. Trial commenced on Wednesday, December 9, 1981, and concluded on December 11, 1981.

The amended answers added four persons, including Introvigne, as expert witnesses, but did not give the general nature of their testimony as requested by the interrogatory. Two of the experts' addresses were shown as being in Independence, Kansas and Introvigne and one other as being in South Boston, Massachusetts. Defendant's attorney called plaintiffs' attorneys on Thursday, December 3, at approximately 4:00 p.m. and a conference call was held on the following day at approximately 1:00 p.m. between counsel for plaintiffs and defendant and the trial judge. Introvigne was not mentioned in either call.[2]

Defendant contended at trial and here that plaintiffs' counsel would have known that Cole Hersee would have expert witnesses and plaintiffs' counsel made no effort to find out who they were. Plaintiffs sought no relief from Cole Hersee but had sent interrogatories to it which were apparently due to be answered on December 5. After the third-party claim was severed, plaintiffs' attorney told Cole Hersee's attorney that the answers need not be filed. Because plaintiffs' counsel likely assumed that Cole Hersee would have expert witnesses does not excuse defendant from not furnishing his name earlier. Defendant should have advised plaintiffs' attorneys of Mr. Introvigne in sufficient time for plaintiffs' attorneys to have prepared for trial with Introvigne's possible testimony in mind. Receiving this information on a Saturday with trial the following Wednesday and with the other necessary trial preparations, plaintiffs' counsel obviously did not have time to take depositions of the four witnesses, investigate them and their testi-

---

2. The record is silent whether any of the other expert witnesses included in the amended an-

swers were mentioned.

mony, and prepare for trial with them in mind.

The trial court has wide discretion in the admission or exclusion of testimony when it is challenged on the basis that it was not properly disclosed by answers to interrogatories. *Bethell v. Porter,* 595 S.W.2d 369, 377 (Mo.App.1980); *Missouri Public Service Company v. Allied Manufacturers, Inc.,* 574 S.W.2d 509, 511 (Mo. App.1978); *Central and Southern Truck Lines, Inc. v. Westfall GMC Truck, Inc.,* 317 S.W.2d 841, 847 (Mo.App.1958). After evaluating the matters to be considered in such a situation, see *Missouri State Park Board v. McDaniel,* 473 S.W.2d 774, 776–778 (Mo. App.1971), we conclude that there was no abuse of discretion in preventing the testimony of Introvigne. This point is denied.

The judgment is affirmed.

MAUS, P.J., and HOGAN, J., concur.