793 S.W.2d 446 (1990)
In re the Marriage of W.E.F., Respondent/Cross-Appellant,
v.
C.J.F., Appellant/Cross-Respondent.
Nos. 54917, 54919.
Missouri Court of Appeals, Eastern District, Division Three.
June 12, 1990.
Motion for Rehearing and/or Transfer Denied August 8, 1990.
Application to Transfer Denied September 11, 1990.
*447 Theodore S. Schechter, Bruce Elliot Friedman and Cynthia Ann Sobel, Clayton, for appellant/cross-respondent.
Chester Arthur Love, Jr., Daniel P. Card, II, Bryan L. Hettenbach, and Allan F. Steward, Clayton, for respondent/cross-appellant.
Motion for Rehearing and/or Transfer to Supreme Court Denied August 8, 1990.
GRIMM, Judge.
A dissolution case.[1] Wife's brief contains seven points relied on. Through different points, she basically complains that the trial court erroneously awarded primary custody of the children to husband, abused its discretion in the division of property, failed to award interest on installment payments, and awarded her an inadequate amount for attorney fees.
Husband filed a cross-appeal. His brief contains five points relied on. His complaints concern the valuation of assets and *448 the allocation of debts, as well as the amount awarded wife for attorney fees. We modify the judgment by awarding interest on installment payments and reducing the value of two notes. As modified, the judgment is affirmed.
The parties were married on January 1, 1976. They have two daughters; one now ten, the other almost seven years of age. The trial court found that the parties separated on August 14, 1986. The next day, husband filed a petition for dissolution. In due time, wife filed her answer and cross-petition for dissolution.

Wife's Appeal

I. Late Disclosure of Experts
For her first point, wife alleges the trial court erred in overruling her motion to exclude husband's experts and in permitting them to testify. She contends that their disclosure a week prior to trial caused her to suffer substantial prejudice in that she was unable to respond to two witnesses testimony on the custody issue. Further, she was "compelled to incur substantial additional costs in attorneys fees and in expert witness fees." She suggests that the appropriate relief would be a new trial on the custody issue and an award of attorney fees and expert witness fees.
Wife propounded interrogatories on September 18, 1986, including one asking the identification of each expert witness expected to be called at trial. Husband responded, "Not yet determined; will be supplied."
On March 2, 1987, the case was given a number one setting for the week of May 11, 1987. On May 4, 5, and 8, husband notified wife of his experts by hand-delivered letters.[2] Twenty-one experts were identified; four pertained to child custody, the other seventeen to financial aspects.
Trial began on May 11. Before hearing testimony, the trial court took up "motions that have been filed over the weekend and this morning." Among those motions was wife's motion to strike the experts endorsed the previous week, with the further request that they not be allowed to testify. Following a lengthy discussion, the court overruled the motion.
A trial court has broad discretion in the admission or exclusion of testimony when it is challenged on the basis that it was not properly disclosed by answers to interrogatories. McClanahan v. Deere & Company, 648 S.W.2d 222, 230 (Mo.App.S.D.1983). On review, an appellate court determines whether the trial court has abused its discretion in either admitting or rejecting the testimony. If such discretion was abused, we must determine if the trial court erred by either imposing, or refusing to impose, sanctions. See State ex rel. Missouri Highway & Transp. Comm'n v. Pully, 737 S.W.2d 241, 246 (Mo.App.W.D.1987). "The object of sanctions should be to prevent the party who fails to comply with the rule from profiting by [its] own violation." Missouri State Park Bd. v. McDaniel, 473 S.W.2d 774, 776 (Mo.App.S.D.1971) (quoting Gebhard v. Niedzwiecki, 265 Minn. 471, 122 N.W.2d 110, 115 (1963)).

A.
We consider first the property valuation experts. None of husband's property valuation experts testified before May 18. On that day, wife's attorney renewed his motion to exclude the expert witnesses disclosed to him the week of May 4. He brought the case of Ellis v. Union Elec. Co., 729 S.W.2d 71 (Mo.App.E.D.1987) to the court's attention, noting that the slip opinion was handed down May 12.
The transcript contains 32 pages of discussion concerning wife's motion and the effect of Ellis on the proceedings. At the 26th page of these discussions, when little agreement was being reached as to how to proceed, the trial court said: "I'm just going to recess this trial till [all of the valuation expert's depositions] get done." The judge commented that he did not think there was a "choice in view of Ellis."
*449 The trial court then had a brief recess. Following that recess, the court put on the record "what we've concluded." They agreed that one more witness would be heard that morning. That afternoon, the deposition of Dr. Monteleone, husband's child custody witness, would be taken. Further, husband agreed not to use two other custody witnesses, Dr. Ed Dodson and a Dr. Singer. The attorneys anticipated that they would conclude the custody portion of the case the following week.
The court would then take a week's recess to allow the taking of the valuation experts' depositions. All of the attorneys agreed with this procedure. This procedure was established with the understanding that wife's original objections were not being waived.
We do not condone the actions of husband's attorney in failing to timely advise wife's attorney of the names of his expert witnesses. Rule 56.01 requires that information be "seasonably" given. Common courtesy among counsel requires the same thing. As all trial attorneys know, the trial of a case is hard work. Attorneys should not have to take discovery depositions at night and on weekends during trial, especially when compliance with the rules could prevent that hardship.
In Ellis, this court said "untimely disclosure or nondisclosure is so offensive to the underlying purpose and intent of discovery rules that prejudice may be inferred unless, under the circumstances of a particular case, such an inference is dissipated." Id. at 75.
Here the inference is dissipated. As one would expect, the parties' property valuation testimony sharply conflicted. The trial court accepted wife's evidence on the issue of value. Thus, husband did not profit by his late disclosure of the property valuation experts. And, wife did not sustain any prejudice from their testimony.

B.
We turn now to the child custody experts, Dr. James Monteleone and Dr. Sandra Dodson. At the hearing on wife's initial motion to strike, husband's attorney pointed out that Dr. Dodson testified at the pendente lite hearing. Also, wife's attorney had cross-examined Dr. Dodson and had a copy of her testimony.
Dr. Dodson testified on May 14. Her testimony takes up 76 pages in the transcript. Although she is a pediatrician, she was not the children's pediatrician. Rather, she and her husband were friends of husband and wife. They saw husband and wife socially approximately once or twice a month. On about half of these occasions, they would also see the parties' children.
Our reading of her testimony indicates that the great majority of it was "lay" testimony. Occasionally, however, husband's attorney did ask for an opinion based on a reasonable degree of medical certainty. We find any inference of prejudice dissipated because; (1) wife's attorney had cross-examined her during the prior PDL hearing, (2) he had a transcript of her prior PDL testimony, (3) the trial court's findings neither refer to her by name or any of the evidence she gave, and (4) in after-trial motions, the judge commented that he considered her "more of a buddy [of husband] than a doctor."
Dr. Monteleone was husband's other expert custody witness. The trial court did not abuse its discretion in allowing him to testify because the court ordered that his deposition be taken before he was allowed to testify. Further, the trial court found him to be "a vociferous, patent [husband] partisan," whose testimony was "not credible." As a result, wife sustained no prejudice from his testimony. Wife's first point is denied.

II. Custody of Children
In her second point, wife alleges trial court error in failing to reopen the case with respect to the issue of custody. She states that "the mental health and emotional status of the parties and of the children was and is a substantial issue in this case." She contends she was denied a fair trial; because the court erred in (1) denying her motion for psychiatric/psychological examination of husband, (2) excluding the testimony *450 of Dr. Moisy Shopper, and (3) failing to strike the testimony of Drs. Dodson and Monteleone for untimely disclosure.

A.
Preliminarily, we note that § 452.375.2, RSMo Supp.1989 directs the trial court to "determine custody in accordance with the best interests of the child." The court is further directed to consider "all factors," including eight specific factors. The fifth specific factor concerns the "mental and physical health of all individuals involved."
It will be recalled that trial began on May 11. On June 15, which was the seventeenth day of trial, the guardian ad litem called Dr. Shopper as a witness. Dr. Shopper, a psychiatrist, testified that he initially saw husband on June 2, 1986. He then saw husband four more times. At the doctor's request, husband and wife met with him together once. He then saw wife three times, followed by eight more visits with husband.
When the doctor was asked about his visits with husband, husband objected, asserting his patient/physician privilege. The trial court, relying on State ex rel. Husgen v. Stussie, 617 S.W.2d 414 (Mo. App.E.D.1981), sustained the objection. During a colloquy, the trial judge said "I haven't heard mental health mentioned here yet." Based on this statement, wife argues that "the trial court's erroneous and faulty perception of the issues during trial clearly affected and impacted its rulings relative to the admissibility of Dr. Shopper's testimony and to the request ... to reopen the case ... and the renewed motions."

B.
With the above background, we move to wife's first subpoint. She alleges trial court error in denying her motion for psychiatric/psychological examination of husband.
On December 17, 1986, wife filed a motion seeking an order that husband be compelled "to submit to psychiatric and psychological[3] examination and testing." The purpose of the examination was "to analyze and evaluate the basis of [husband's] expressed concerns, fears and allegations of unfitness made against [wife] ... and to determine whether or not [husband] has any characteristics, traits, personality defects or other psychological or psychiatric defects or disorders that bear on the issue of [husband's] fitness as a primary custodian for the minor children."
An order dated December 30, 1986, indicates the motion was "called, heard & denied." We were not furnished with a transcript of that "hearing."
Rule 60.01, on which the motion was apparently based, provides that an examination order "may be made only on motion for good cause shown." By use of the word "may," it is clear that a trial court is vested with discretion to enter such an order. The allegations in the motion in and of themselves were not sufficient to require as a matter of law that the trial court order an examination. No affidavits were attached to the motion to establish "good cause." And, without a transcript of the "hearing", we can not find that the trial court abused its discretion in denying the motion. This subpoint is denied.

C.
For her second subpoint, wife alleges the trial court erred in excluding Dr. Shopper's testimony. The trial court had sustained husband's objection, based on the physician/patient privilege.
Wife made offers of proof concerning Dr. Shopper's testimony. These offers were (1) husband was referred to the doctor by his attorney, (2) Dr. Shopper did not provide any treatment to husband and was not consulted for that purpose, (3) husband made the same complaints and criticisms concerning his wife's care to Dr. Shopper *451 as made to the court, and (4) husband made the same complaints in the joint sessions as he did in the individual sessions.
This opinion need not be extended to examine whether the physician/patient privilege was applicable to each of the four offers of evidence. Even if we assume error in rejecting all four offers of proof, wife sustained no prejudice. Neither of the first two offers of proof would assist the trial court in determining who should receive custody of the children. And, the last two offers could be considered as amounting to cumulative testimony. This subpoint is denied.

D.
Wife's third subpoint concerns the trial court's failure to strike the testimony of Drs. Dodson and Monteleone for untimely disclosure. Our holding under point I-B is also applicable to this subpoint.
Our review of the transcript and the trial court's findings and conclusions fails to demonstrate that the trial court did not fully consider all factors in awarding child custody. The court heard approximately 25 witnesses on this issue. Although there was evidence to support awarding custody of the children to wife, there was also substantial evidence to justify awarding their custody to husband.
"[W]hen there is conflicting evidence regarding the relative fitness of the parents for custody, the resolution of the conflicts and the determination of the credibility of the witnesses will be left to the trial court, and deference will be accorded to its conclusions." Sturma v. Sturma, 674 S.W.2d 626, 627 (Mo.App.E.D.1984). Under the standards enunciated in Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976), we find no abuse of discretion.
Wife's second point relied on is denied.

III. Division of Marital Property
For her third point, wife alleges: "The circuit court erred and abused its discretion in dividing the marital property on an 80% to husband/20% to wife basis. The court erred in that: (A) The court erroneously declared and applied the law by taking into consideration in determining whether wife received a fair and equitable division the magnitude and size of the marital estate, (B) The division is so penal and confiscatory so as to constitute an abuse of discretion and a misapplication of § 452.330, RSMo, which permits a court to take into consideration marital misconduct, and (C) The court failed to balance and consider in its division husband's misconduct."

A.
We first observe that the assets of the parties include holdings in numerous joint ventures, partnerships, and stock in privately held corporations, as well as substantial real estate holdings. Valuation of such assets is difficult, and is typically subject to wide differences of opinion.
One example is sufficient to demonstrate the wide range of opinions given to the trial court. The parties own a note of St. Louis Associates, often referred to as a "wrap note." On a personal statement of his financial condition dated December 31, 1985, husband valued this note at $18,330,000.00. On his October, 1986 statement of property filed with the trial court, he valued it at $1,100,000.00. At trial in June, 1987, he placed a negative value of $941,251.00 on the note. Other witnesses for husband placed differing values on this asset.
On the other hand, wife's expert valued this asset at $13,444,000.00. This is the value which the court placed on this asset. Based on the trial court's findings that the parties' assets are valued at $20,599,655.00, it is obvious that the wrap note is their most significant asset.
The court recognized that the valuation of this note might be inaccurate. To minimize the risk of an inaccurate valuation, the court distributed the note in kind to the parties, with wife receiving twenty percent and husband receiving eighty percent. In addition, as to this note, the court ordered each party to be "responsible for any encumbrance thereon to the extent of the percentage of such note awarded" to them, *452 except husband was responsible for a debt to a bank.

B.
For her first subpoint, wife complains that the trial court took into consideration the "magnitude and size of the estate." In support of her point, she quotes a statement made by the trial court during oral argument on the Motion for New Trial. At that time, wife's counsel was arguing that his client had been unduly penalized for adultery and other marital misconduct. The court commented: "Are you talking about only $4 million plus?"
It is first noted that this statement was made on April 11, 1988, some sixty days after the decree was entered. Secondly, it was made in response to lengthy oral argument on the new trial motion. We are unable to place any improper connotation on this statement.
Rather, in explanation of the division of property, we note several statements in the trial court's findings. The trial court noted that although both parties contributed "to the acquisition of the marital property, husband [was] the primary acquisitioner." The trial court characterized wife's contribution, "if existent, extremely minimal temporally, quantitatively and domestically."
Further, the trial court found "that the irretrievable breaking of this marriage was caused solely by the flagrant and blatant misconduct of wife, [as detailed earlier in its findings], during the cohabitation of the parties and any hope for its preservation was doomed by the continued brazen misconduct of wife after the separation of the parties." Wife's first subpoint is denied.

C.
For her second and third subpoints, wife contends that the division is "so penal and confiscatory so as to constitute an abuse of discretion" and "the court failed to balance and consider in its division husband's misconduct."
As was noted earlier, the trial court valued the parties assets at $20,599,855.00. It also found that they had debts totalling $5,748,325.00. It ordered husband to pay $5,725,000.00 of the debts, while wife was directed to pay $23,325.00.
If husband's debts of $5,725,000.00 are subtracted from the assets awarded to him, he has a net award of $10,754,884.00. Similarly, if wife's debts of $23,325.00 are subtracted from the assets awarded her, she has a net award of $4,096,646.00. Based on these awards, husband received 72% and wife 28% of the net assets.
Wife recognizes the well known principles that a trial court is vested with discretion in dividing the marital property and that the division of property need not be equal, but rather just. She also acknowledges that conduct is a factor which may be considered.
It is clear that comparing cases based on percentages awarded a party is fruitless. (Wife cites divisions of 80%-20% and 86%-14% which were reversed, Balven v. Balven, 734 S.W.2d 909 (Mo.App.E.D.1987) and In re Marriage of East, 708 S.W.2d 777 (Mo.App.S.D.1986); husband cites divisions of 90½%-9½% and 84%-16% which were affirmed, Dove v. Dove, 773 S.W.2d 871 (Mo.App.W.D.1989) and Mika v. Mika, 728 S.W.2d 280 (Mo.App.E.D.1987)). We have reviewed the evidence and the trial court's findings. We find no abuse of discretion. Murphy, 536 S.W.2d at 32. Subpoint denied.
Wife's third point relied on is denied.

IV. Interest on Installment Payments
For her fourth point relied on, wife contends the trial court erred concerning the $920,796.00 compensating cash judgment awarded to her. The judgment, payable over 20 years, does not bear interest. As a result, she contends its present value is substantially less than the amount she was awarded.
In dividing the property, the court first assigned values to all assets. It then found that a "fair, equitable and conscionable distribution of the marital property" required that 80% go to husband and 20% *453 to wife. Wife's 20% share was valued at $4,119,971.00.
The court awarded her 20% of the wrap note, as well as other specific assets, with a total value of $3,199,175.00. It then awarded her a judgment "to make up deficit between value of specific marital property awarded to [wife] and value of total marital property to which she is entitled. $920,796.00."
Both husband and wife filed motions for a new trial or to alter/amend the judgment. The trial court made some amendments, including one affecting the $920,796.00 judgment. It provided that execution could be issued on $250,000.00 of the judgment, but that the balance of $670,796.00 could be paid in 240 equal monthly installments of $2,794.98. No interest was to be paid except on any delinquent payments.
"In dividing marital assets, installment payments are proper if justified by the parties' economic circumstances." In re Marriage of Paul, 704 S.W.2d 278 (Mo. App.S.D.1986). Here, the lack of liquid assets justified the installment payments.
We recognize that there may be situations where failure to award interest may not constitute an abuse of trial court discretion. See, e.g. Beckman v. Beckman, 545 S.W.2d 300 (Mo.App.E.D.1976) (division of partial interest in family farm with 10 years of payments); Geil v. Geil, 647 S.W.2d 161 (Mo.App.E.D.1983) ($13,230.50 payable over 3 years); and Corbett v. Corbett, 728 S.W.2d 550 (Mo.App.W.D.1987) ($50,000.00 payable over 2 years). Here, however, we see no reason why interest should not be paid.
Failure to award interest, according to wife, reduces the "present value" of the 240 monthly installments to $310,647.92, based on the statutory interest rate of nine percent. Husband does not contest that computation.
If interest is not awarded on these installments, wife would be receiving less than the 20% of the marital property distributed to her. The value of installment payments is "their present value, not the total of payments." Goller v. Goller, 758 S.W.2d 505, 508 (Mo.App.W.D.1988); see also Spicer v. Spicer, 585 S.W.2d 126, 129 (Mo.App.S.D.1979).
In view of the amount to be paid and the length of time over which the payments are to be made, interest should have been awarded. Paul, 704 S.W.2d at 279. The judgment of the trial court is amended to award interest based on that currently allowed for judgments, nine percent per annum. Id. § 408.040.[4] The amount of each monthly payment is adjusted to reflect this award of interest.

V. Fees and Expenses
For her fifth point, wife alleges trial court error in overruling her motions for sanctions filed under § 514.205, as well as denying her request for attorney fees, expert witness fees, and expenses.
Wife's fees and expenses totalled $384,454.50. Of that amount, $187,000.00 was for wife's valuation expert. Although finding this witness' testimony to be credible, the trial court found his fee was unreasonable. Also, the trial court specifically made "no finding as to the reasonableness of [another witness'] fee of $13,500.00."
The trial court found wife's attorney fees of $150,000.00 were reasonable. It ordered husband to pay $50,000.00 of that amount, and denied her request that husband pay the other fees and expenses.

A.
We turn first to the trial court's denial of wife's motion for sanctions. Section 514.205 concerns frivolous and bad faith pleadings and proceedings. It authorizes a court to award attorney fees and compensation to a party opposing such pleadings or proceedings. To make such an award, a court must (1) conduct a hearing, (2) make a finding that the pleading or proceeding "was had frivolously and in bad faith," and (3) assess an amount based on the costs and expenses attributable to opposing those pleadings or proceedings.
*454 Wife filed her motion for sanctions on February 17, 1988. That motion, as well as numerous other motions, was taken up on April 11, 1988.
The transcript of the April 11 proceedings contains 104 pages. The motion for sanctions is identified on the second page of those proceedings; it is not mentioned again. No evidence was offered to support the motion; the motion was not argued. We find no abuse of trial court discretion in the denial of this motion.

B.
Wife also sought attorney fees, expert witness fees, and expenses. The trial court ordered husband to pay $50,000.00 of her attorney fees. It also ordered husband to pay 80% of the guardian ad litem fees and court costs, except husband was ordered to pay all court costs incurred as a result of his "allegations of child sex abuse." Wife was ordered to pay the other 20%.
Section 452.355 authorizes a trial court to order a party to pay a reasonable amount of the other party's attorney fees and costs. If an award is to be made, the trial court must consider "all relevant factors including the financial resources of both parties."
Here, the trial court awarded wife a portion of her attorney fees. It denied the balance of her request "in view of the substantial money and income producing property" she was awarded. Such denial, she contends, amounts to abuse of trial court discretion. However, in view of "the broad discretion with which [a trial court] is vested," Kieffer v. Kieffer, 590 S.W.2d 915, 919 (Mo. banc 1979), we find no abuse of discretion. Murphy, 536 S.W.2d at 32.
Wife's fifth point is denied.

VI. Affidavits and Rule 78.05
When wife filed her motion for new trial, three affidavits were attached to it. Husband responded with a motion to strike the affidavits, which was sustained. For her sixth point on appeal, wife alleges trial court error in striking those affidavits.
Wife's affidavits were from a psychologist, a psychiatrist, and her trial attorney. In her brief, wife contends "the affidavits were filed to demonstrate and to show to the Court that `good cause' existed for the Court to reopen the matter and to hear additional evidence as permitted by Rule 78.01."
In her nine page affidavit, the psychologist expressed numerous opinions. Among other things, she said (1) "psychiatric and psychological evaluations of both the parents and of the minor children are essential and should be ordered in highly contested child custody disputes," (2) "such an examination and evaluation ... is both necessary and appropriate so that the trier of fact ... has before it not only the best, but all available information," and (3) from her review of the trial court's findings and decree, there are "substantial psychological patterns and issues which should be evaluated and considered before any final determination is made as to [child custody]." She then sets forth "some of the psychological patterns and issues which come to mind and should be explored and considered as a result of her review."
Similarly, in a four page affidavit, the psychiatrist stated that he had read the trial court's findings and decree. He expressed the opinion that it was necessary for the court to "be aware of the emotional and psychological condition of the parties." Further, he stated a psychiatric examination would provide the court with "relevant, crucial information for a determination of custody." Finally, he concluded the trial court was "deprived" of evidence and information necessary to determine custody.
The third affidavit, from wife's trial attorney, reviewed the course of this litigation. It relates problems with expert witness discovery, denial of requests for examinations, and other litigation matters.

A.
Rule 78.05 permits the filing of affidavits when an "after-trial motion, including a motion for new trial, is based on facts not appearing of record." Here, the first paragraph *455 of the motion for new trial alleges trial court error concerning its denial of pre-trial motions for psychiatric examinations, as well as its refusal to permit Dr. Shopper to testify. The affidavits of the psychologist and psychiatrist were incorporated into the motion in support of this allegation.
As to the denial of the psychiatric examination, we found no trial court error. See point II-B above. Concerning the refusal to allow Dr. Shopper to testify, we found that wife sustained no prejudice even if trial court error was assumed. See point II-C above.
Further, we question whether the allegation in the motion for new trial "is based on facts not appearing of record." Rather, the allegation in the motion concerns the legal issues of a denial of an examination and the admissibility of evidence.
These two affidavits were also incorporated into paragraph nine of the motion in support of wife's allegation that the award of custody of the children to husband was erroneous. A review of paragraph nine and its six subparagraphs fails to disclose any "facts not appearing of record."

B.
Reference to the trial attorney's affidavit appears only in paragraph five of the motion. This affidavit relates to allegations in paragraph four. Paragraph four seeks a new trial to allow proper response to husband's expert witnesses. We have found that wife sustained no prejudice as a result of the late disclosure of experts. Again, we find no "facts not appearing of record" in the motion for new trial justifying this affidavit.
Paragraph five of the motion describes the affidavit. Paragraph five, as with the other previously mentioned paragraphs, does not contain any "facts not appearing of record."

C.
Wife cites four cases in support of her allegation of error. None of them are applicable or pertain to a motion for new trial. Two pertain to motions to dismiss, and state the oft-repeated statement that a "motion does not prove itself." Taylor v. Coe, 675 S.W.2d 148, 150 (Mo.App.S.D. 1984) and Pogue v. Associated Elec. Co-op, Inc., 760 S.W.2d 169, 171 (Mo.App.S.D. 1988). The other two concern "unsworn remarks" of counsel during trial. State v. Randall, 275 S.W.2d 758, 763 (Mo.App.W. D.1955) and Flanigan v. City of Springfield, 360 S.W.2d 700, 706 (Mo.Div. 2 1962).
We find no error in the striking of these three affidavits. Wife's sixth point is denied.

VII. Reasonableness of Expert's Fee
For her final point, wife alleges trial court error in "finding that the claim of Stephen Roulac, one of wife's experts on the issue of valuation[,] for $187,000.00 was unreasonable."
We make two brief observations. First, the trial court "particularly" found Roulac's valuation credible and adopted his valuation of the "wrap note." Second, the trial court did not order wife to pay Roulac's fee; rather, it merely declared that the fee was "not assessed against husband." (emphasis original).
We fail to see how wife was harmed or sustained any prejudice by a finding that a witness she hired had a fee which this trial court found to be unreasonable. Point denied.

Husband's Appeal

I. Valuation of "Wrap Note" and Gannon Properties
For his first point, husband alleges trial court error in valuing the "wrap note" and three Gannon properties. He contends that the "valuations were abuses of discretion, were not based on substantial evidence, were against the weight of the evidence, and were erroneous declarations and applications of the law."

A. "Wrap Note"
As we said in point III-A of wife's appeal, the trial court distributed the *456 "wrap note" in kind. Husband received 80% of the note and wife received 20%.
At trial, husband testified "that there's no value to the [wrap] note at this point in time." Husband also said that the "outstanding encumbrances underneath [the note] exceed [its value] by $941,000." If the trial court would have accepted husband's valuation testimony, husband would have received 80% of an asset which had no value and wife would have received 20% of that valueless asset.
In his brief, husband points out several "errors" in Roulac's calculations on which the trial court based its valuation. Husband points out that if his "corrections" based on 1986 audited figures were made, the note would have a $10,225,000.00 value. Or, if Roulac had made other adjustments based on 1987 data, the value of the "wrap note" would be $4,674,000.00.
Because the trial court divided the "wrap note" in kind, husband receives the same 80% whether the "wrap note" is valued at Roulac's and the trial court's $13,444,000.00, at a "corrected" $10,225,000.00 or $4,674,000.00, or husband's "no value" or a negative $941,000.00. Only time may tell what is the actual dollar value of the "wrap note". Regardless of whether that figure is higher or lower than the value placed on this asset by the trial court, husband and wife will still receive a 80%-20% split of that asset.
The trial court noted "that husband was very clear and definite in his request that the court in its division of marital property distribute all of the parties' interest in the ["wrap note" and Gannon properties] to him." One wonders why husband sought this asset if it is valueless. As the trial court observed, it "did not detect such remarkable altruism in husband throughout the course of this long trial."
It is commonly known that the value placed on an asset often depends on whether the evaluator is the seller or the buyer of the asset. A similar situation often exists when parties in dissolution cases place values on assets they anticipate either receiving or not receiving. Trial courts have the superior opportunity to see, hear, and evaluate the witnesses, and are entitled to give the testimony of each witness such weight as the trial court finds warranted. Bess v. Bess, 720 S.W.2d 757, 758 (Mo.App. E.D.1986). A trial court may accept or reject part or all of the testimony of a witness. O'Neal v. O'Neal, 703 S.W.2d 535, 537 (Mo.App.E.D.1985).
Here, the trial court specifically found "incredible the testimony of husband and other witnesses presented by him" on the valuation of the "wrap note" and Gannon properties. We defer to the trial court's assessment of credibility. Id.

B. Gannon Properties
We turn now to the Gannon properties. On appeal, husband complains of the value placed on three joint ventures, referred to as Gannon I, Gannon II, and Gannon III. These joint ventures are with John Hancock Life Insurance Company, and involve real estate in Florida and Missouri.
As to Gannon I, husband's statement of financial condition dated December 31, 1985, valued this asset at $921,800; his statement of property filed with the court in October, 1986, indicated $512,000.00; and at trial, husband testified the value was a negative $2,866,500.00.
On the other hand, Roulac valued the parties' interest in Gannon I at $2,150,000.00. This is the value the trial court assigned to this asset.
As to Gannon II, husband's 1985 statement showed a $772,500.00 value; his 1986 statement, a value of $358,000.00; and at trial, his testimony was a negative $553,500.00. Roulac's value was $760,000.00, which the trial court adopted.
Finally, as to Gannon III, this asset was acquired in 1986 and therefore was not on the 1985 statement. On the 1986 statement, husband valued it at $136,000.00, while at trial he valued it at a negative $866,100.00. Roulac's value was $530,000.00, which is the value assigned by the trial court.
As with the "wrap note," husband's brief has recalculated Roulac's figures, using the *457 same adjustments mentioned above. With such adjustments, Gannon I has a value of either $1,109,000.00 or $1,272,000.00; Gannon II a value of either $877,000.00 or $517,000.00; and Gannon III $327,000.00 or $215,000.00. Because the calculations based on the 1987 data are "a more current reflection of the performance of the properties," husband suggests we adopt those values. Such adoption would result in values of $1,272,000.00, $517,000.00, and $215,000.00.
The total value assigned to these three properties (1) by the trial court is $3,440,000.00, (2) by husband at trial is a negative $4,286,100.00; and (3) by accepting the suggestion in husband's brief, $2,004,000.00. We do not have "a firm belief" that the trial court erred in the valuation it placed on these properties. Rather, there is substantial evidence to support those values, the values are not against the weight of the evidence, and there is no error of law. Murphy, 536 S.W.2d at 32. Point denied.

II. Allocation of Debt
For his second point, husband alleges trial court error in "unfairly allocating responsibility for debts". He contends the value of the "wrap note", which secures a $5,125,000.00 debt to Mercantile Bank, should be reduced by that amount.
Husband incurred the debt to Mercantile Bank when he purchased and operated a business in 1986. A subchapter S corporation was formed for this business. The operation of this business generated $4,000,000.00 to $5,000,000.00 in tax losses. As husband (and not wife) is the named shareholder, all benefit of the loss carry forward will inure only to his benefit.
In its findings, the trial court stated "that the loss carry forward is of substantial value; however, it is impossible to determine the value at the present time without knowledge of husband's future income tax liability." Since husband would be the beneficiary of this tax loss, the trial court said "it is fair, equitable and conscionable that husband" pay this debt.
Husband's brief refers us to Oldfield v. Oldfield, 666 S.W.2d 17 (Mo.App.E.D.1984) (Oldfield I) and Oldfield v. Oldfield, 688 S.W.2d 778 (Mo.App.E.D.1985) (Oldfield II). He contends that, as in Oldfield I and II, since he "obtained loans secured by a lien on the wrap note, i.e., by pledging the wrap note, the value of the interest in the wrap note is the fair market value of the wrap note, less the lien. ($13.44 million minus $5.125 million)."
In Oldfield I, this court's opinion reflects that the trial court considered a $60,000.00 deed of trust on the marital home in determining the home's value. It failed, however, to consider encumbrances on other assets in valuing those assets. In addition, the trial court did not allocate any debts other than the marital home debt.
In Oldfield II, this court noted that "the trial court, in valuing the total marital estate, did not consider the marital debts of the parties." Oldfield II, 688 S.W.2d at 780. The trial court, in Oldfield II, had valued the marital estate at $534,050.00. When all debts were considered, however, this value was reduced to $365,171.00. This failure to consider the debts caused this court to redistribute the assets and allocate the debts.
Here, unlike Oldfield I and II, the trial court considered all of the marital debts. All of the debts were allocated to either husband or wife. The trial court had that authority. Costley v. Costley, 717 S.W.2d 540, 543 (Mo.App.S.D.1986). A trial court in establishing a fair division of the marital assets may consider who is to be responsible for marital debts. Gonzalez v. Gonzalez, 689 S.W.2d 383, 386 (Mo.App.E. D.1985). Just as we found no error in the trial court awarding husband 80% of all the assets, we find no error in its allocation of the debts. Point denied.

III. Joint Ownership of "Wrap Note"
Husband's third point alleges trial court error "in retaining joint ownership in the wrap note, in prohibiting `amendment' of the wrap note without wife's consent and in not fixing the total sums to be received by wife for her interest in the wrap note."

*458 A.
As to the joint ownership issue, husband argues that "the trial court should have divested Wife for a compensated value." He suggests that he be awarded the entire note, and any sum payable to wife "should be paid over 20 years, without interest." By so doing, he contends, there would be one final adjudication of the property rights of the parties and further disputes would be prevented. In support, he cites Hopkins v. Hopkins, 597 S.W.2d 702 (Mo. App.W.D.1980), Corder v. Corder, 546 S.W.2d 798 (Mo.App.W.D.1977), and Davis v. Davis, 544 S.W.2d 259 (Mo.App.W.D. 1976).
In Davis, the trial court created a tenancy in common in the parties' residence, as well as in household property, shares of stock in both privately and publicly held corporations, and dividends. In reversing and remanding with directions, the Davis court made these pertinent comments: "[A] division which leaves the parties tenants in common of personal property susceptible to division in kind should be avoided in the interest of preventing the unnecessary extension of disputes and ill feeling.... [As to real estate,] a tenancy in common solution should be reserved for the unusual situation where the economics involved call for such a solution." Id. at 264.
Davis, which is apparently the first Missouri case discussing this issue, disapproves of leaving personal property "susceptible to division in kind" in tenancy in common. When read in context, Davis was obviously referring to the household property, publicly held corporate stock, and dividends. As to real estate, tenancy in common was "reserved" for the unusual situation, and the parties' situation was not unusual.
Davis does not aid husband. Here, there is no evidence that the "wrap note" is "susceptible to division in kind." Further the "wrap note" is subject to Mercantile Bank's security interest; there is no evidence that husband has sufficient current liquid assets to pay the note. To the contrary, his evidence at the hearing on post-trial motions was that any money he was "able to generate, [he needed] to pay to keep [his business creditors] satisfied."
Although citing and relying on Davis, Corder did not retain the different requirements set out in Davis for maintaining tenancy in common ownership in personal or real property. Rather, it lumped the two types of property together.
Corder does not preclude the use of a "tenancy in common solution." Corder, 546 S.W.2d at 805. When such a solution is resorted to in "`unusual situation[s]' ... because of the `economics involved,'" Corder directs that "the trial court should specifically state its reasons for doing so in its decree." Id. In Corder, the record failed to reveal any "economics involved" justifying the tenancy in common. Corder, 546 S.W.2d at 806.
Although merging the treatment of personal and real property, Corder recognizes that tenancy in common is appropriate in "unusual situations" due to the "economics involved." Here, both the trial court's findings and the record establish that the "wrap note," the parties primary asset, satisfies the Corder requirements.
Finally, as to Hopkins, suffice it to say that the opinion reiterates the principles enunciated in Davis and Corder. Hopkins, however, presumed erroneous judgment because the trial court failed to state a reason for the parties retention of their close corporation stock as tenants in common. Hopkins, 597 S.W.2d at 706. The Hopkins court then examined the record and was unable to find "unique economic considerations" justifying tenants in common ownership. Hopkins, 597 S.W.2d at 708.
Neither the holdings or rationale in Davis, Corder, or Hopkins persuade us to modify the trial court's distribution of the "wrap note". All requirements of those three cases have been met. In addition, we find support for our holding in Murray v. Murray, 614 S.W.2d 554, 556 (Mo.App.E.D. 1981).

B.
Husband also asserts trial court error in prohibiting amendment of the "wrap note" *459 without wife's consent. He again relies on Davis, Corder, and Hopkins.
The "wrap note" is a mortgage note from St. Louis Associates to husband. The trial court, having distributed the note on an 80%20% basis, clarified what it intended. Its decree states that the percentage interest extends to all payments of principal and interest under the note, and to all rights of ownership in the underlying security in case of foreclosure. The decree then provides, "Neither party shall have the right to alter, amend, modify or change the terms and conditions of said `Wrap' note ... without the written consent of the other party." (emphasis added).
The trial court's decree created a tenancy in common ownership in the "wrap note," with husband having an 80% interest and wife a 20% interest. As such, neither party could by his or her sole action, alienate or encumber the "wrap note" or the other cotenant's interest therein, in the absence of authorization or ratification on the part of the other cotenant. 20 AM.JUR.2d, Cotenancy and Joint Ownership § 96 (1962); see also Land Clearance for Redevel. Auth. v. Dunn, 416 S.W.2d 948, 949-950 (Mo.Div. 2 1967). Thus, that which the trial court spelled out is that which flows from ownership of property as tenants in common.

C.
Finally, husband asserts trial court error "in not fixing the total sums to be received by wife for her interest in the wrap note." Husband's argument is basically that presented previously under A above. For the reasons previously expressed, we reject this argument.
Husband's third point relied on is denied.

IV. Valuation of Gannon Companies and its Notes
For his fourth point, husband alleges trial court error "in valuing the Gannon Companies including Gannon Management of Missouri, and two promissory notes from the Gannon Company to husband totaling $1,279,074.00." He contends that it was error to treat the promissory notes as assets without considering the offsetting liabilities.
Gannon Management Company of Missouri is a wholly owned subsidiary of The Gannon Company. Husband owns all of the stock of The Gannon Company. The management company provides real estate management services to the apartment complexes covered by the "wrap note," as well as other property.
We find no error in the trial court's valuation of Gannon Management. Roulac estimated the company to be worth $290,000.00. He based his computation on a price/earnings ratio calculated on his estimate of 1987 pre-tax earnings. Husband, on the other hand, placed a zero value on this company. The trial court valued this asset at $290,000.00. As stated previously, we defer to the trial court's assessment of credibility.
Turning to The Gannon Company, we observe that the trial court left a blank space in the "value" column opposite its entry. Husband testified that it had no value and wife did not offer any evidence that it had any value.
An examination of The Gannon Company financial records is helpful in determining the value of the $1,279,074.00 of notes it owes husband. The December 31, 1986, company balance sheet was the most recent financial statement before the trial court. That statement contains a breakdown for each company in the Gannon group, as well as a consolidated statement for The Gannon Company and its subsidiaries.
The consolidated statement discloses Current Assets total $273,773.00, while Other Assets were $1,880.00. In addition, Equipment and Leasehold Improvements were $128,975.00; this account consisted primarily of office and computer equipment. Thus, assets totaled $404,628.00.
On the other side of the ledger, Current Liabilities totaled $716,838.00. $466,816.00 of that amount was a note due husband. Long-term debt, also due husband, was shown at $604,294.00. The Stockholders' Equity consisted of $84,820.00 stock and *460 paid-in capital, while Retained Earnings were a negative $1,001,324.00.
If the notes due husband are deleted, the Current Liabilities are reduced to $250,022.00. If we assume all assets are worth their stated amount and could be reduced to $404,628.00 cash to pay the Current Liabilities, $154,606.00 would remain. Based on these assumptions, The Gannon Company would have $154,606.00 to pay the $1,071,110.00[5] notes then due husband, and the stock would have no value.
It is understandable why the trial court listed these notes as assets, gave them the values it did, and distributed these notes to husband. In husband's 1985 statement of financial condition, these loans were shown as assets. Husband also listed these loans in his statement of property filed in 1986. And, unfortunately for husband, his credibility on values was found wanting.
We observe, however, that notes to the 1985 financial statement reflect that the combined book value of The Gannon Company and Gannon Management of Florida[6] show "a deficit of $568,000." Further, on the 1986 statement, husband showed the present value of The Gannon Company and its subsidiaries, as well as Gannon Management Company of Florida, at zero.
As stated previously, we defer to the trial court's determination of witness credibility. Here, however, the undisputed record evidence discloses that the $1,279,074.00 notes are owed by a company that does not have the assets to pay those notes. For that reason, the trial court's decree is amended to reflect the value of the "Promissory note(s) receivable, Gannon Companypayor", including both short term and long term, to a total of $154,606.00.
Accordingly, the $20,599,855.00 total value of all assets is reduced by $1,124,468.00 (1,279,074.00 minus 154,606.00) to $19,475,387.00. Husband was obligated to pay wife 20% of the $1,279,074.00, or $255,814.80. Now he is obligated to pay 20% of $154,606.00, or $30,921.20. Thus, the judgment (note) due wife is reduced from $920,796.00 to $695,902.40. Other than for this adjustment, husband's fourth point is denied.

V. Attorney Fees
For his final point, husband alleges trial court error in awarding wife $50,000.00 of her $150,000.00 attorney fees. He contends that the award constitutes an abuse of discretion.
In its findings and decree, the trial court determined that wife was capable of paying her own attorney fees and legal expenses. However, the trial court found husband introduced and "frenetically pursued" a child abuse allegation. That allegation "was so lacking in merit that the time and effort expended by wife's attorney must be considered from an attorney's fee standpoint." After determining that one-fourth to one-third of wife's attorney fee was caused by this allegation, the trial court awarded wife $50,000.00 of her attorney's fee.
A trial court is granted broad discretion in awarding attorney fees. Kieffer v. Kieffer, 590 S.W.2d 915 (Mo. banc 1979). In a bench tried case, "our primary concern is the correctness of the trial court's result, not the route taken to reach it." Todd v. Todd, 772 S.W.2d 14, 15 (Mo.App.E.D. 1989). Only when the trial court is shown to have abused the broad discretion with which it is vested in awarding attorney fees should its award be overturned. Kieffer, 590 S.W.2d at 919. No such showing was made here. Husband's final point is denied.

Conclusion
The trial court's judgment is modified to award nine percent per annum interest on *461 the compensating cash judgment (installment note) awarded wife. The amount of that compensating cash judgment is reduced from $920,796.00 to $695,902.40. As modified, the trial court's judgment is affirmed.
SATZ, P.J., and SMITH, J., concur.
NOTES
[1] The case took five weeks to try, with 55 witnesses testifying. The 24 volume transcript has 4591 pages. The trial court's findings of fact, conclusions of law, and decree consumes 61 pages.
[2] At trial, Theodore Schechter represented husband and John Turcotte represented wife. Alan Stewart was guardian ad litem.
[3] As noted in Brooks v. Brown, 744 S.W.2d 881, 882 (Mo.App.E.D.1988), Rule 60.01 pertains only to examinations by a physician. Most psychologists are not physicians; and therefore, are not within the rule. Federal Civil Procedure Rule 35, which is similar to Rule 60.01, was amended by Congress in 1988, to include examinations by licensed psychologists.
[4] All statutory references are to RSMo 1986, unless otherwise specified.
[5] The difference between $1,071,110.00 and $1,279,074.00 arises from additional amounts husband loaned the company between December 31, 1986, and the time when the dissolution hearing began.
[6] Gannon Management of Florida is not included in the consolidated statement for the Gannon Company and its subsidiaries. The trial court valued the Gannon Management Company of Florida at $220,000.00. No issue is raised concerning this asset.